**Marcus Owen PHARES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–08–00246–CR.**

Court of Appeals of Texas, Beaumont.

Submitted Oct. 2, 2009.

Decided Nov. 12, 2009.

David W. Barlow, Beaumont, for appellant.

Tom Maness, Crim. Dist. Atty., Ann Manes, Asst. Dist. Atty., for state.

Before McKEITHEN, C.J., KREGER and HORTON, JJ.

## OPINION

STEVE McKEITHEN, Chief Justice.

A jury convicted appellant Marcus Owen Phares of felony theft of money in the amount of at least $1,500 but less than $20,000. *See* TEX. PEN.CODE ANN. § 31.03(a), (e)(4)(A) (Vernon Supp. 2009).[1] The trial court assessed punishment at two years of confinement in a state jail facility, then suspended imposition of sentence, placed Phares on community supervision for five years, and ordered Phares to pay restitution in the amount of $9,100. On appeal, Phares raises a single issue, in which he contends that the evidence was legally insufficient to sustain his conviction. We reverse and render.

THE EVIDENCE

Kylie Walker testified that she once lived with her former husband Daniel at a residence they owned in Jefferson County, Texas. As a result of Hurricane Rita, the roof, fencing, and vinyl siding of the home were damaged. On May 1, 2006, the Walkers entered into a contract with Phares, a construction contractor who was also their neighbor, to replace the vinyl siding. Pursuant to the contract, which specified that the first draw for materials would be $7,100, the Walkers gave Phares a check for $7,100, and Phares cashed the check. According to Kylie, Phares "and two other workers came over, pulled off ... about half of the vinyl; and that was basically it." Kylie testified that Phares and his workers worked for approximately three days. Kylie testified that Phares and his workers placed the old vinyl siding in the Walkers' back yard and never removed it from the back yard. Kylie explained that neither Phares or his workers ever removed the old insulation from the home, and although new insulation was delivered and placed in the garage, it was never installed by Phares or his workers. Kylie testified that new siding was never delivered.

Kylie testified that on approximately May 12, 2006, Phares asked for an additional $2,000. Phares told Kylie that he had used the previous check for materials, and "he needed additional money to pay the workers for what they had already done[.]" According to Kylie, Phares never provided any documentation showing how he had actually spent the money. Kylie gave Phares another check for $2,000. Kylie explained that after she gave Phares the additional check, neither Phares nor his workers ever returned to her home to do any further work. Kylie testified that

---

1. Because the applicable sections of the statute have not substantively changed since the date of Phares's offense, we cite to the current version of the statute.

Phares told her twice that the vinyl siding was on back order, and she believed Phares intended to finish the job soon. The Walkers contacted the authorities in late July or early August, and the Walkers sent a ten-day demand letter to Phares by certified mail, return receipt requested. Although Phares received the letter, he did not respond. The Walkers hired another contractor to finish the work, and they eventually asked the Nederland Police Department to file a theft charge against Phares. Kylie testified that she and her husband never instructed Phares not to return to the property.

Daniel Walker testified that the roof, vinyl, and fencing of the home was damaged after Hurricane Rita. According to Daniel, Phares placed a bid with the Walkers to replace the vinyl siding, and they hired Phares to do the work and gave him a check for $7,100. Daniel explained that although the written contract did not contain a total contract price, the parties agreed that the total cost would be $12,000. Daniel testified that Phares and some of his workers removed about half of the vinyl from the house, but they did not remove the insulation. Daniel estimated that the workers were at the home for two or three days. Daniel testified that Phares asked for an additional $2,000, and Kylie gave Phares a check for that amount on May 12, 2006. According to Daniel, Phares told them he needed the additional money "because he needed to pay his people for work that they had already done, and to have enough money left over to finish buying the vinyl siding[.]" Daniel testified that Phares and his workers never returned after May 12, 2006, and no additional materials were delivered. Daniel testified that although he requested invoices and receipts from Phares, Phares never provided them. Daniel and Kylie contacted the police and sent Phares a ten-day demand letter, but Phares did not

respond and never completed the job. Daniel testified that after he and Kylie hired another contractor to complete the job, he instructed Phares to stay off of the property.

Detective James West of the Nederland Police Department testified that he was assigned to the investigation. Detective West testified that the District Attorney's office instructed the Walkers that to have a criminal complaint, they were required to send a ten-day demand letter to Phares. The Walkers provided Detective West with a copy of the demand letter, as well as documentation indicating that Phares received the letter on July 12, 2006. Detective West referred the case to the District Attorney's office on August 15, 2006, and the District Attorney's office asked Detective West to contact Phares and to obtain Phares's side of the story. Detective West contacted Phares, and Phares came to the Nederland Police Department and spoke with Detective West. Detective West told Phares that if Phares could provide documentation that he had secured materials or done a significant amount of work at the Walkers' home, the matter "would be referred to a civil court, not a criminal court." Detective West testified that Phares indicated that he would return with documentation, but he never provided any documentation. According to Detective West, Phares stated that his attorney had advised him not to provide the documentation. Detective West subsequently tendered the case to the District Attorney's office. The State rested at the conclusion of Detective West's testimony.

Phares testified that he is a contractor doing business as "Double D Contracting." Phares explained that he entered into a contract with the Walkers to remove vinyl siding and to replace the insulation on their home. Phares testified that the total price was "$12,800–something." Phares

testified that he had "people on the job [for] two weeks." According to Phares, he asked the Walkers for an additional $1,200 because he needed to finish paying his workers, but the Walkers instead gave him a check for $2,000. Phares testified that the work he did was valued at $9,100, and he stated that he kept his receipts in the job folder. Phares explained that after the job file was lost, he did not attempt to reconstruct the documents it contained. Phares testified that he conducted all of his business on a cash basis. Phares explained that he never ordered the vinyl siding because stores were not accepting orders at that time. Phares estimated that he spent $4,000 to $4,200 on labor for the job, as well as $3,000 to $3,500 for materials.

Phares testified that he stopped taking the siding off because he "started running into issues with Mr. and Ms. Walker." Phares testified that he never had a problem with the Walkers until the Walkers began going through a divorce. Phares explained that he kept a job file containing his measurements and receipts from the job in the Walkers' garage, but the file "came up missing ... when we started first having issues." Phares also testified that he was asked to stay away from the property, which prevented him from finishing the job, but he could not "remember the exact date."

Ronda Ard, a carpenter who had worked for Phares at the Walkers' home, testified that she worked for Phares at the Walkers' home there for approximately a week while removing vinyl siding from three sides of the home and installing foam insulation. Ard testified that she also removed nails, replaced a broken J channel, and "installed a couple of fixtures that goes [sic] around lights that accommodate the vinyl siding as well." Ard explained that she eventually stopped work because she "was told that the vinyl siding ... had come in, but it was the wrong one ... and it was on reorder." Ard testified that she and the other workers were paid for the work they did at the Walkers' home.

Phares's uncle, Marvin Bailey, Jr., testified that he knew about the contract between Phares and the Walkers to install siding on the Walkers' home. Bailey testified that he saw Phares and the workers remove the old siding and install insulation. According to Bailey, work eventually stopped due to problems between the Walkers and Phares.

### PHARES'S ISSUE

In his sole appellate issue, Phares argues that the evidence was legally insufficient to support his conviction. Specifically, Phares asserts that the State failed to prove that he had the requisite intent to deprive the Walkers of any property.

Section 31.03(a) of the Texas Penal Code provides that a person commits theft "if he unlawfully appropriates property *with intent to deprive the owner of property.*" TEX. PEN.CODE ANN. § 31.03(a) (emphasis added). The indictment in this case alleged that Phares unlawfully appropriated money owned by Daniel Walker. Appropriation of property is unlawful if it is without the owner's effective consent, and consent is not effective if it was induced by deception or coercion. *Id.* §§ 31.01(3)(A), 31.03(b)(1). Therefore, the State had the burden to prove that when Phares received money from the Walkers, he intended to unlawfully deprive them of their money, *i.e.*, to take the money without intending to complete the job as promised. *See* §§ 31.01(3)(A), 31.03(a), (b)(1). Phares asserts that the facts of this case are indistinguishable from those present in *Cox v. State,* 658 S.W.2d 668 (Tex.App.-Dallas 1983, pet. ref'd), and he argues that as in *Cox,* the State failed to produce any evi-

dence that he "intended to deprive the complainant of any property[,]" but instead proved "merely a contract dispute[.]" In *Cox*, the appellant entered into an agreement with the complainant to do some repair work at the complainant's home. *Cox*, 658 S.W.2d at 669. The appellant repaired the complainant's air conditioner and did some plumbing work, and the two discussed additional work that needed to be done in the kitchen, including the purchase and installation of a stove, oven, range top, and Vent–A–Hood. *Id.* Appellant returned to the complainant's home with an oven, but did not connect it. *Id.* at 670. Appellant informed the complainant that he had been unable to obtain the other appliances, and he asked for additional money. *Id.* Appellant failed to return to complete the job, and he never delivered the remainder of the appliances or returned the complainant's money. *Id.*

In analyzing whether the State proved that appellant intended to deprive her of money when he induced her to pay him, the *Cox* court began by noting that the complainant's admission that appellant performed numerous services as promised "clearly negates that any representation or promise by appellant was false at the time complainant surrendered any of the money to him." *Id.* at 671 (citing *Kinder v. State*, 477 S.W.2d 584, 586 (Tex.Crim.App.1971)). The Court concluded that the evidence merely established a dispute over the appellant's performance of the remodeling contract. *Id.* Additionally, the Court noted that "[t]he mere fact that one fails to return or pay back money after failing to perform a contract, for the performance of which the money was paid in advance, does not constitute theft." *Id.* (citing *Hesbrook v. State*, 149 Tex.Crim. 310, 194 S.W.2d 260, 262 (1946)). The Court concluded that the State failed to prove that appellant intended to deprive the complaint of the money when he took it, and therefore found that the evidence was legally insufficient. *Id.*

In its brief in this case, the State made no effort to distinguish *Cox*; in fact, the State's brief does not even cite *Cox*. As previously discussed, the State was required to prove that when Phares induced Daniel Walker to pay him money, Phares intended to unlawfully deprive Walker of the money, *i.e.*, to take the money without performing the agreed-upon work. *See* Tex. Pen.Code Ann. § 31.01(3)(A), § 31.03(a); *see also Wilson v. State*, 663 S.W.2d 834, 836–37 (Tex.Crim.App.1984) (To prove theft, the State must show intent to deprive the complainant of property at the time the appellant accepted remuneration pursuant to the contract.). On this record, there is no evidence from which such a deceptive intent can be inferred. *See Cox*, 658 S.W.2d at 669–71; *see also Phillips v. State*, 640 S.W.2d 293, 294 (Tex.Crim.App.1982) (holding that when the appellant and the complainants entered into a residential construction contract, the complainants made a down payment, and the defendant took measurements, drew up plans, but ultimately failed to perform under the contract, the evidence was insufficient to show that the defendant obtained the down payment by deception). As in *Cox* and *Phillips*, in the case *sub judice*, the State failed to prove theft, but instead merely proved the existence of a contractual dispute. Accordingly, we reverse the trial court's judgment and render judgment that Phares is acquitted of theft.

REVERSED AND RENDERED.

HOLLIS HORTON, Justice, dissenting.

In its opinion, the majority holds that the evidence is legally insufficient to support the jury's verdict. Although it applies the proper standard, in my opinion,

the majority does not apply the standard properly to the facts of this case. In reviewing a record for legal sufficiency, we review all of the evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences from the evidence, rational jurors could have found the essential elements of the crime beyond a reasonable doubt. *See Roberts v. State,* 273 S.W.3d 322, 326 (Tex.Crim.App.2008) (citing *Jackson v. Virginia,* 443 U.S. 307, 318–319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

All of the decisions the majority cites in reaching its conclusion were decided prior to the Texas Court of Criminal Appeals' decision in *Geesa v. State,* 820 S.W.2d 154 (Tex.Crim.App.1991), *overruled on other grounds,* 28 S.W.3d 570 (Tex.Crim.App. 2000). As criticized and rejected in *Geesa,* "focusing on the existence of an 'outstanding reasonable hypothesis inconsistent with the guilt of the accused', at least where the hypothesis of innocence stems from inconsistencies in the evidence presented at trial, effectively repudiates the jury's prerogative to weigh the evidence, to judge the credibility of the witnesses, and to choose between conflicting theories of the case." *Id.* at 159. In my opinion, the majority focuses on the existence of a contractual relationship between the parties and Phares's partial performance of that contract in reaching its conclusion that there is no evidence to demonstrate that Phares, from the relationship's beginning, intended to steal from the homeowners.

In my opinion, the evidence before the jury allowed it to conclude that Phares did not intend to fulfill the contract from its outset. The evidence shows that Phares contracted with the homeowners to remove

and replace the vinyl siding from their home. The contract, dated May 1, 2006, reflects that Phares was to receive a "draw on material" in the amount of $7,100.00. On that same date, Phares was given a check for $7,100.00; the check's memorandum field recites: "For material-house." Subsequently, according to one of the homeowners, Phares came for two or three days with two other workers and removed "about half" of the vinyl siding from the house. With respect to the materials specified in the contract, the evidence reflects that Phares purchased and had delivered insulation at a cost of approximately $1,300.00. According to one of the homeowners, Phares never installed the insulation.

On May 12, Phares asked for an additional $2,000.00. Phares told one of the homeowners he needed the money because "the money that we had given him [ ] was used on the material, and he needed additional money to pay the workers for what they had already done...." On that same day, the homeowner gave Phares an additional check for $2,000.00. After that, neither Phares nor his workers returned to work on the home, nor were any additional materials delivered to the homeowners. In July, the homeowners sent Phares a letter, requesting that he complete the job or give them a full refund. Phares did not respond.

In summary, the record reflects that Phares received at least $7,100.00 that was specifically designated as being for the purchase of materials. According to Phares, he purchased approximately $1,300.00 of insulation materials.[1] He never purchased any additional insulation or the vinyl, all of which would have been required to complete the terms of his con-

---

1. Phares also testified that after the work started, he purchased additional material that he did not consider as being included within the original contract price. Phares testified

that he spent about $1,600.00 on these materials. Even if we include the expenditures for materials that were not initially included in the contract price, the threshold amount of

tract. After he was presented a demand for a full refund, Phares failed to make any refund, despite the fact that he had received $7,100.00 for materials and acknowledged spending much less than that amount on the materials specified in the contract. In my opinion, reasonable jurors could infer from these facts that, from the moment he entered the contract, Phares never intended to purchase the materials required to complete the contract. The existence of the contract and the fact that he partially fulfilled the contract are only circumstances of a reasonable hypothesis of innocence; the existence of these facts should not remove from the jury—through the guise of our review of legal sufficiency—the right to weigh the evidence to determine Phares's intent at the outset of his contractual relationship with the homeowners. Thus, even though the evidence conflicts, a reasonable juror could conclude that Phares committed felony theft. Because the majority holds that the evidence is legally insufficient to support the jury's verdict, when in my opinion it is not, I respectfully dissent.

$1,500.00 necessary to establish the commission of felony theft was still proven. *See* TEX. PEN.CODE ANN. § 31.03(a), (e)(4)(A) (Vernon Supp. 2009).