

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-10-00109-CR

_____

JAMES EHRHARDT, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 115th Judicial District Court
Marion County, Texas
Trial Court No. F14011

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

Convicted by a jury of theft from Paula Painter of over $1,500.00 but less than $20,000.00, James Ehrhardt opted to have the trial court determine his sentence. Ehrhardt was sentenced to two years' imprisonment, but the sentence was suspended, and Ehrhardt was placed on three years' community supervision and assessed restitution in the sum of $10,000.00.[1]

Contact between Ehrhardt and Painter arose after Painter's brother's house was damaged by fire and a hazard insurance company supplied approximately $100,000.00 for its restoration. Since Painter's brother was ill and hospitalized (eventually expiring during the course of the rehabilitation of the house), Painter was handling the arrangements for repair on his behalf. In so doing, she entered into an oral contract with Ehrhardt, the terms of which were disputed. Painter and a person who overheard their negotiations testified that Ehrhardt agreed to complete all of the repairs for $65,000.00, while Ehrhardt maintained during grand jury testimony (provided to the jury) that the contract was for an indeterminate amount wherein he would receive payment for his time, his expenses, and a percentage of the costs in compensation.

As work slowly progressed, Painter ultimately paid Ehrhardt seven installments of money totaling $86,422.50. When Ehrhardt again requested additional funds, Painter refused. Ehrhardt

---

[1] The trial court's sentence is consistent with the agreed recommendation of the State and defense.

walked off the job and Painter filed criminal charges. Painter eventually hired another contractor to finish the job.[2]

On appeal, Ehrhardt argues the evidence is legally and factually insufficient.[3] Under the general theft statute through which Ehrhardt was charged, in order to establish that Ehrhardt committed theft, the State had the burden to establish that (1) Ehrhardt, (2) with intent to deprive the owner (Painter) of property, (3) unlawfully appropriated property, (4) without the effective consent of the owner.[4] TEX. PEN. CODE ANN. § 31.03 (Vernon Supp. 2010); *Baker v. State*, 986

---

[2]Painter paid this contractor approximately $30,000.00.

[3]However, on oral argument, Ehrhardt acknowledged the decision in *Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010), a plurality opinion which abolished the factual sufficiency review established by *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996), and its progeny. With this, Ehrhardt acknowledges the inefficacy of the factual insufficiency argument. Accordingly, we do not address it.

[4]Section 31.03 provides:

> (a)  A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property.
> (b)  Appropriation of property is unlawful if:
> (1)  it is without the owner's effective consent;
> . . . .
> (e)  Except as provided by Subsection (f), an offense under this section is:
> . . . .
> (4)  a state jail felony if:
> (A)  the value of the property stolen is $1,500 or more but less than $20,000, or the property is less than 10 head of sheep, swine, or goats or any part thereof under the value of $20,000; . . . .

TEX. PENAL CODE ANN. § 31.03. "Deception" is defined as:

> (A)  creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true;

3

S.W.2d 271, 274 (Tex. App.—Texarkana 1998, pet. ref'd). "Appropriate means *any* 'exercise of control over' the personalty in question . . . ." *McClain v. State*, 687 S.W.2d 350, 353 n.7 (Tex. Crim. App. 1985). The Texas Penal Code provides that consent is ineffective if "induced by deception. . . ."[5] TEX. PENAL CODE ANN. § 31.01(3)(A) (Vernon Supp. 2010). "Induce" means "to bring about, produce, or cause." RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 975

---

(B)     failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true;
(C)     preventing another from acquiring information likely to affect his judgment in the transaction;
(D)     selling or otherwise transferring or encumbering property without disclosing a lien, security interest, adverse claim, or other legal impediment to the enjoyment of the property, whether the lien, security interest, claim, or impediment is or is not valid, or is or is not a matter of official record; or
(E)     promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed.

TEX. PENAL CODE ANN. § 31.01(1) (Vernon Supp. 2010). "Deprive" is defined as:

(A)     to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner;
(B)     to restore property only upon payment of reward or other compensation; or
(C)     to dispose of property in a manner that makes recovery of the property by the owner unlikely.

TEX. PENAL CODE ANN. § 31.01(2) (Vernon Supp. 2010).

[5]We note the theft statute provides alternative means and methods of committing theft. *See* TEX. PENAL CODE ANN. § 31.03. We further note that the State did not allege any particular method of committing theft. *Cf. Geick v. State*, 321 S.W.3d 706, 711 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (when indictment only alleged theft by deception, State is bound by that alleged statutory alternative manner and means). Because the State did not allege any particular statutory manner of commission, the hypothetically-correct jury charge would include all the alternative methods of commission contained in the theft statute, including theft by deception. *See Gollihar v. State*, 46 S.W.3d 243, 254 (Tex. Crim. App. 2001); *Curry v. State*, 30 S.W.3d 394 (Tex. Crim. App. 2000); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

(2d ed. 2001). Ehrhardt argues the State failed to establish that Ehrhardt had an intent to deprive and appropriated property without the owner's effective consent. On appeal, the State has argued two theories of guilt. According to the State, Ehrhardt committed theft by providing Painter with a fraudulent accounting[6] and by misapplication of the funds Painter paid to Ehrhardt.

In the *Brooks* plurality opinion, the Texas Court of Criminal Appeals found "no meaningful distinction between the *Jackson v. Virginia*[7] legal-sufficiency standard and the *Clewis*[8] factual-sufficiency standard, and these two standards have become indistinguishable." *Brooks*, 323 S.W.3d at 902 (4-1-4 decision). In a concurring opinion, Judge Cochran pointed out that the United States Supreme Court has rejected a legal sufficiency test that requires a finding that "no evidence" supports the verdict because it affords inadequate protection against potential misapplication of the "reasonable doubt" standard in criminal cases. *Id.* at 916–17 (Cochran, J., concurring). Rather than meeting a mere "no evidence" test, legal sufficiency is judged not by the quantity of evidence, but by the quality of the evidence and the level of certainty it engenders in the fact-finder's mind. *Id.* at 917–18. Under *Jackson*, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 318–19. We

---

[6]Ehrhardt refers to this document as a "list of expenses" and the State refers to this document as a "document." We will refer to the document as an accounting for the sake of convenience. We are not suggesting this document was a formalized accounting.

[7]443 U.S. 307 (1979).

[8]*Clewis*, 922 S.W.2d 126.

are directed to subject challenges to the sufficiency of the evidence to the hypothetically-correct jury charge analysis. *Malik*, 953 S.W.2d at 240.

When the charged conduct concerns a matter for which the alleged victim and the accused had a contractual relationship, certain concerns arise. "[A] claim of theft made in connection with a contract requires proof of more than an intent to deprive the owner of property and subsequent appropriation of the property." *Baker*, 986 S.W.2d at 274. Neither the mere failure to perform a contract[9] nor the mere failure "to return or pay back money after failing to perform a contract, for the performance of which the money was paid in advance,"[10] are sufficient to establish guilt of theft. When alleging theft in connection with a contract, the State "must prove the defendant did not perform the contract and knew he was not entitled to the money, not merely that there is a dispute about the amount rightfully owed." *Jacobs v. State*, 230 S.W.3d 225, 229 (Tex. App.—Houston [14th Dist.] 2006, no pet.). As this Court explained in *Baker*, "under the terms of [a contract] individuals typically have the right to 'deprive the owner of property,' albeit in return for consideration." *Baker*, 986 S.W.2d at 274. The Texas Court of Criminal Appeals has noted "what separates lawful acquisitive conduct from theft is knowledge of a crucial 'circumstance surrounding the conduct' -- that the acquisition is 'without the owner's consent.'" *McClain*, 687 S.W.2d at 354 (footnotes omitted). Thus, the focus of our inquiry is not whether Ehrhardt

---

[9]*Phillips v. State*, 640 S.W.2d 293, 294 (Tex. Crim. App. [Panel Op.] 1982).

[10]*Phares v. State*, 301 S.W.3d 348, 352 (Tex. App.—Beaumont 2009, pet. ref'd) (quoting *Cox v. State*, 658 S.W.2d 668, 671 (Tex. App.—Dallas 1983, pet. ref'd)).

deprived Painter of property, but whether Ehrhardt unlawfully deprived Painter of property without Painter's effective consent.

We will first examine whether Ehrhardt ever intended to perform the contract and whether his promise to perform was an illusion. Second, we will examine whether the accounting Ehrhardt provided to Painter rendered Painter's subsequent payments to be without effective consent. Concluding, we will examine whether Ehrhardt's use of the bank account created for the construction project in dispute constituted theft.

## I. The Evidence Does Not Establish the Contract Was a Ruse

One method of establishing theft, in connection with a contractual dispute, is to establish the "appellant had no intention of fulfilling his obligation under the agreement, and his promise to perform was 'merely a ruse to accomplish theft by deception.'" *Jacobs*, 230 S.W.3d at 229 (quoting *King v. State*, 17 S.W.3d 7, 15 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd)). While the State does not explicitly argue this theory of guilt, we believe it is prudent to first clarify there is insufficient evidence the contract was an illusion or a ruse.

The record establishes that a substantial amount of work was performed. Painter testified Ehrhardt had ten to twelve workers on the job in its early stages. Painter elaborated on the work that Ehrhardt caused to be done: he performed electrical work,[11] removed the fire debris, installed temporary walls, installed new sewer lines, repaired rafters in the attic, tore down a rotten

---

[11]The exact amount is not specified.

7

awning adjacent to the house, removed the roof of the house, removed part of the concrete slab, retextured remaining drywall, removed a fireplace, removed an outside wall, installed a header in an addition, installed drywall (except for the basement), rebuilt ceiling joists, installed a new concrete slab for the addition, installed decking on the main house, roughed in the addition, installed a door and eight windows on the addition, installed shingles, installed (but did not finish) cabinets, placed the furnace in place on the premises (but failed to fully install it), and painted ceilings and walls. Ehrhardt alleged the project was ninety-five percent complete.

Ehrhardt, nevertheless, was far from completion. The siding on the main house had not been replaced, the air-conditioning system and duct work had not been installed, and there was still some smoke damage that needed to be cleaned. In addition, the light fixtures remained uninstalled, some molding and countertops needed to be installed, and some of the plumbing had to be redone.[12] Painter testified that Ehrhardt had installed a wall incorrectly and not remedied the error.[13] Painter testified the kitchen cabinets had to be coated with Kilz and the cabinets had to be modified. Ehrhardt's failure to complete the project or do the work correctly, however, is insufficient, by itself, to support a finding of guilt.

The amount of work performed can negate any intent to deprive at the time of formation of the contract. *See Cox*, 658 S.W.2d at 670. In this case, Ehrhardt performed a substantial amount

---

[12]It is unclear whether it had to be redone or just finished. The plumbing subcontractor testified he had additional work to do, but did not do it because Ehrhardt walked away from the job.

[13]Painter testified the siding contractor told her the wall had excessive "give."

of repairs on the house. No rational juror could have concluded, at the time the contract was formed, that Ehrhardt had no intention of fulfilling his obligation under the agreement or have concluded that the contract was a mere illusion or ruse.

## II.     The Accounting Provided to Painter Is Insufficient Evidence

The State presents what would be a more problematic issue by arguing that Ehrhardt committed theft by providing Painter with a false accounting[14] prior to her final payment. Painter insisted on receiving an accounting prior to her final $15,000.00 payment to him. Although Ehrhardt provided Painter with an accounting as demanded, this accounting contained substantially incorrect entries. After Painter had filed criminal charges, Ehrhardt provided Painter with a second accounting which was quite different from the first. The first accounting showed expenses totaling $71,490.00. The State introduced evidence that a number of the expenses were false. For example, the first accounting specifies the building permit cost $1,000.00 but the building permit only cost $250.00. The accounting listed the cost for Transit Mix (concrete) as being $3,113.00, but the actual cost was $866.00. The State also argued the first accounting was false because it did not match the second accounting and because, at the time Ehrhardt provided Painter with the first accounting, over $20,000.00 remained in the bank

---

[14]We will refer to the two lists of expenses as accountings for the sake of convenience.

9

account.[15]  Ehrhardt concedes the first accounting was false, but argues the false accounting was insufficient to establish theft.

## A.  Intent to Deprive Can Be Formed After the Formation of the Contract

Ehrhardt argues that the State was obligated to establish Ehrhardt intended to unlawfully deprive Painter of property when the contract was formed.   Under Ehrhardt's stated position, once a contract is formed absent the requisite criminal intent, the dispute remains always civil in nature. We disagree.   While we agree "[r]elevant intent to deprive the owner of property is the accused's intent at the time of the taking,"[16] we disagree that a criminal intent to deprive cannot arise after the formation of the contract.   This Court has previously stated "[a] claim based upon malfeasance in connection with a contract requires proof of the false pretext or fraud in order to become a viable criminal prosecution."  *Baker*, 986 S.W.2d at 274.   The requisite criminal intent can be formed after the formation of a contract.   We emphasize, however, the deprivation of property cannot occur prior to the formation of the requisite intent.  *Cortez v. State*, 582 S.W.2d 119, 120–21 (Tex. Crim. App. [Panel Op.] 1979).   Thus, if the intent to unlawfully deprive did not develop until after the formation of the contract, there must be an additional deprivation of property in connection with the recently formed criminal intent.

---

[15]We note Ehrhardt had deposited money from other construction projects in this bank account both before and after the dispute arose.

[16]*Wilson v. State*, 663 S.W.2d 834, 836–37 (Tex. Crim. App. 1984); *Lopez v. State*, 316 S.W.3d 669, 676 (Tex. App.—Eastland 2010, no pet.).

10

**B.     There Is Sufficient Evidence of an Intent to Deprive**

Ehrhardt argues there was no intent to unlawfully deprive because the errors in the fraudulent accounting were merely the result of poor bookkeeping and the hasty preparation of that accounting.   Kelley Ehrhardt (Ehrhardt's former wife, who acted as his bookkeeper) testified she has never "been trained as a bookkeeper."   Kelley explained the inaccuracies in the first account arose as a result of her instructions from Ehrhardt that the accounting should be a "guesstimate" and the time in which she had to prepare it.   Kelley testified that whereas she only spent three hours preparing the first (fraudulent) accounting, she expended three days in preparing the second accounting.   For example, Kelley explained the overcharge for the permit by claiming they were including estimated costs of the final inspection.

Ehrhardt also argues that the expenses he incurred on the job exceeded the total payments made by Painter.   The record does contain some evidence that Ehrhardt performed work roughly equivalent to the total payments made by Painter.   After being indicted, Ehrhardt provided another accounting (the second) which shows expenses incurred in excess of Painter's payments.[17] Ehrhardt claims that this evidence in the second accounting establishes that the errors in the first accounting were unintentional.   State's Exhibit 25 (the second accounting, prepared after the indictment was issued), indicates expenses were incurred in excess of Painter's payments.

---

[17]We will refer to this accounting as the second accounting.

11

Ehrhardt introduced receipts and time sheets to support Exhibit 25.[18]  According to this accounting, Ehrhardt's expenses exceeded Painter's payments by $1,927.77.  While personal gain is normally considered in determining whether a person has the requisite intent to commit theft,[19] personal gain is not an element of theft.  The evidence by Ehrhardt that his total expenses exceeded Painter's payments does not prevent a rational juror from concluding that Ehrhardt possessed the requisite intent to unlawfully deprive.

A rational juror could have disbelieved Kelley's testimony.  The first accounting falsehoods are sufficient for a rational juror to infer an intent to deprive.  The jury usually must infer intent from circumstantial evidence, rather than direct proof.  *See Guevara v. State*, 52 S.W.3d 45, 50 (Tex. Crim. App. 2004).  The jury can draw reasonable inferences so long as each inference is supported by evidence presented at trial.  *Hooper v. State*, 214 S.W.3d 9, 15–16 (Tex. Crim. App. 2007).  "The reviewing court must give deference to 'the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"  *Id.* at 13 (quoting *Jackson*, 443 U.S. at 318–19).  The evidence is sufficient that Ehrhardt had the requisite intent to unlawfully deprive.

---

[18]Our own comparison of the second accounting and the receipts revealed a few minor inconsistencies.  While Ehrhardt provided receipts for many of the entries, the record does not contain receipts for a number of the expenses listed in the second accounting.  Several receipts were not listed in the second accounting and at least two receipts suggested expenses greater than the amount contained in the accounting.  We note that many of the receipts included materials which were apparently used for other construction projects.

[19]*Christensen v. State*, 240 S.W.3d 25, 32 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd).

**C.     The Deception Did Not Induce Painter's Consent**

Alternatively, Ehrhardt argues the deception did not induce Painter's consent.   The record contains some evidence the first accounting induced Painter's consent.   During direct examination, Painter testified that when Ehrhardt requested the final payment, she initially refused to renegotiate the contract, requested an accounting, and requested copies of the receipts as a condition of advancing more money.   Although Painter did not receive the receipts, Painter did receive the first accounting and subsequently paid Ehrhardt an additional $15,000.00 upon receipt of the accounting.   A rational inference from this evidence would be that the deception contained in the first accounting induced Painter's consent.

However, Painter's testimony on cross-examination directly contravenes this inference. Painter testified the deception contained in the first accounting did not induce the final payment. Instead, Painter testified she had doubts as to the validity of the accounting and, despite these doubts and the refusal to provide receipts, made the final payment.   On cross-examination, the following colloquy occurred:

> A.     [By Painter]   I refused to pay him anymore money until I received the receipts from wherever he got the materials and payroll until I could match them up and see what had gone on with all these funds.   At that time I was doubting the validity of this paper, the original paper and wanted to double check and cross check exactly what had gone on with the receipts.
>
> Q.     [By Defense Counsel]   Did you give Mr. Ehrhardt any money as a result of him giving you that first paper?
>
> A.     No, all the deposits are here that - -

13

. . . .

      Q.     So it didn't - - it didn't induce you to give him any money, it was just something you asked for that he provided to show where money had gone?

      A.     Yes, and then I asked for the receipts to double check it against his claim. He refused to give me the receipts.

      Q.     Okay, when you finally got the receipts, the total amount of those receipts --

      A.     Sir, I never got the receipts.

On direct examination, Painter had testified that Ehrhardt told her the receipts were "none of [her] business." Although Painter never received the receipts, Painter testified that the first accounting did not induce her final $15,000.00 payment.

As Judge Cochran's concurring opinion in *Brooks* emphasized, the mere existence of some evidence is not sufficient in criminal cases—there must be sufficient evidence for a rational juror to reach a conclusion beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring). Legal sufficiency is judged not by the quantity of evidence, but by the quality of the evidence and the level of certainty it engenders in the fact-finder's mind. *Id.* at 918. In *Brooks*, the Texas Court of Criminal Appeals provided the following analogy:

> The store clerk at trial identifies A as the robber. A properly authenticated surveillance videotape of the event clearly shows that B committed the robbery. But, the jury convicts A. It was within the jury's prerogative to believe the convenience store clerk and disregard the video. But based on *all* the evidence the jury's finding of guilt is not a rational finding.

*Brooks*, 323 S.W.3d at 907 (quoting *Johnson*, 23 S.W.3d at 15 (McCormick, P.J., dissenting)).

Similar to the above analogy, Painter's testimony prevents the jury from inferring the deception induced Painter's consent. The State has not directed this Court to where in the record Painter testified the deception did, in fact, induce her last payment. On cross-examination, Painter offered a few explanations for why she continued to pay Ehrhardt. Painter testified "[M]y brother was dying, I was busy, and I was overwhelmed in many many ways." Painter also testified, "We were too far invested." A rational juror could not have concluded, beyond a reasonable doubt, the first accounting induced Painter to make the final payment, despite the fact that she made receipt of that accounting a condition for the delivery of the final payment. A rational juror could not have concluded the first accounting brought about, produced, or caused Painter to make the final payment.

While Painter paid Ehrhardt more than she was legally obligated under the original oral contract, this overpayment is not necessarily evidence of theft. A person does not commit a crime by re-negotiation of a contract after its formation. While not legally required to agree to different terms, parties can agree to different terms if desired. Painter admitted she told Ehrhardt several times during the early stages of the project to inform her if he needed more money. If money was

15

voluntarily given to the appellant and there is insufficient evidence in the record to show that the money was obtained by deception, the conviction cannot stand. *Phillips*, 640 S.W.2d at 294; *Jacobs*, 230 S.W.3d at 229–30; *Baker*, 986 S.W.2d at 274. If Painter chose to pay Ehrhardt more than she was legally obligated to pay, that was her choice—provided the choice was not influenced by deception. Because there is insufficient evidence that Ehrhardt's deception in the first accounting induced Painter's consent, the first accounting fails to provide sufficient evidence that Ehrhardt committed theft.

## III. Misappropriation of Funds

The State's remaining argument is that the misappropriation of funds in the bank account opened by Ehrhardt for Painter's construction project is sufficient evidence of theft. Shortly after forming the oral contract, Ehrhardt opened an account at Citizens National Bank. Painter testified that Ehrhardt told her that "[t]he account would be strictly for this project and all the receipts would match, everything would match up through this account."[20] The evidence established Ehrhardt used the funds in the account not only for the Painter reconstruction job, but also for personal use and other construction projects. We note, though, that Ehrhardt had deposited, both before and after the first accounting, money into the account from sources other than Painter.

---

[20]Painter testified she was with Ehrhardt when he opened the account. Moore, the employee of Citizens National Bank who opened the account, testified Painter was not present in her office when the account was open, but conceded Painter might have been somewhere else in the bank.

16

According to the State, Ehrhardt's use of the account as a slush fund[21] is sufficient evidence Ehrhardt committed theft.

In *Baker*, this Court concluded the defendant's act of writing checks payable to "cash" with specific notations that were fraudulent was sufficient evidence to support a jury's verdict. *Baker*, 986 S.W.2d 271. *Baker*, however, is distinguishable from the current case because the bank account in *Baker* belonged to the victim. *Id.* The defendant was merely added as a signatory to an account owned by the victim. *Id.* In this case, the evidence establishes Ehrhardt—not the victim—owned the bank account.

The State presumes the money in the account belonged to Painter. Penny Moore, an employee of Citizens National Bank (where the account in question was located) testified that Ehrhardt was designated the owner of the account and Kelley also had access to the account. At oral argument, the State argued for the first time that the funds were held in trust. While the law requires funds paid to a contractor to be held in trust,[22] the jury was never instructed on this law

---

[21]The State argues Ehrhardt needed to use this account as a slush fund because there was a child support lien on his other accounts. During his grand jury testimony admitted by agreement of the parties, Ehrhardt acknowledged he had child support liens on some of his other accounts. The State introduced a letter from the Texas Attorney General's Office notifying the bank that as of October 23, 2008, Ehrhardt owed $21,196.50 in past due child support.

[22]We note that the Texas Property Code provides payments for a contract to improve real property are trust funds. TEX. PROP. CODE ANN. § 162.001 (Vernon Supp. 2010). Misappropriation of funds paid for improvements to real property is a criminal offense under the Texas Property Code. TEX. PROP. CODE ANN. § 162.031 (Vernon Supp. 2010), § 162.032 (Vernon 2007). Ehrhardt, though, was indicted under TEX. PENAL CODE ANN. § 31.03. Further, the jury was not instructed on these provisions of the Texas Property Code. The State does not argue the hypothetically correct jury charge would contain an instruction on any of these sections of the Texas Property Code. *See* TEX. PROP. CODE ANN. §§ 162.001, 162.031, 162.032. The "hypothetically correct" jury charge cannot completely rewrite the indictment. *Gollihar*, 46 S.W.3d at 253.

17

and Ehrhardt was not charged under the statute which would create such a trust. The State did not allege that the funds were held in trust in the indictment and the jury was not instructed the funds were held in trust. The jury was merely presented with evidence that the account was owned by Ehrhardt. Painter wrote checks payable to Ehrhardt, relinquishing any control over the money when Ehrhardt used it for other purposes. Without any allegation that these funds were held in trust, a rational juror could not have concluded that Ehrhardt exercised control over Painter's property. Rather, the evidence only established that Ehrhardt exercised control over his own property, which had been turned over to him by Painter. While the transactions are evidence of bad business practices and might be a violation of the Texas Property Code,[23] they are not evidence of theft as alleged in the indictment.

Further, although the record established deception, a rational juror could not have concluded Ehrhardt's deception induced Painter's consent to deposit money into the account. We note the State does not argue the deception (i.e., the account would be used only for Painter's construction project) induced Painter to make additional payments to Ehrhardt. Further, the State has not directed this Court to any place in the record revealing evidence that Ehrhardt's deception induced Painter's consent. The evidence merely establishes deception. There is no evidence the deception brought about, produced, or caused Painter to consent to the appropriation of property. A rational juror could not infer, beyond a reasonable doubt, that the deception induced Painter to

---

[23]*See* TEX. PROP. CODE ANN. §§ 162.031, 162.032.

18

make additional payments to Ehrhardt. The evidence is insufficient to support a finding that the deception induced Painter's consent.

## IV.     Conclusion

We conclude, based on the evidence before this Court, that no rational juror could have found, beyond a reasonable doubt, that Ehrhardt was guilty of theft. The evidence established Ehrhardt had poor business practices, but the evidence did not establish Ehrhardt committed theft. Ehrhardt did not commit theft by failing to complete his contractual obligations. Although the two theories offered by the State (based on the false accounting and on misapplication of bank funds) both establish deception, each fails to establish that Ehrhardt committed theft. Because Painter testified that the false accounting did not induce her to make the final payment to Ehrhardt, no rational juror could have concluded, beyond a reasonable doubt, the deception in the first accounting induced Painter to consent to the final payment. Although Ehrhardt committed deception in representing to Painter that the bank account would be used solely for Painter's project, no rational juror could have concluded, beyond a reasonable doubt, either that the funds in the account were Painter's property or that the deception in the first accounting induced Painter's consent to additional payments. Viewed in a light most favorable to the prosecution, no rational juror could have found, beyond a reasonable doubt, all the elements of theft.

For the reasons stated, we reverse Ehrhardt's conviction and render a judgment of acquittal.

Bailey C. Moseley
Justice

Date Submitted: January 25, 2011
Date Decided: February 25, 2011

Publish

20