

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-13-00078-CR

HENRY TAYLOR, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 40623-B

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley
Dissenting Opinion by Justice Carter

# O P I N I O N

In November 2010, Henry Taylor, Jr., the owner and operator of Taylor's Custom Signs in Longview,[1] agreed to perform two jobs for Reich Builders (owned by Jeff Reich).[2]  First, Taylor was to construct and wire an LED illuminated monument sign for commercial property Reich owned in Kilgore.  Second, Taylor was to refurbish a pole sign at the Lock Box (a storage facility in Longview) and install an LED message board on that sign.  Taylor represented that the sign work could be completed before Christmas of that year.  When the work remained unfinished in April 2011, Taylor was indicted for theft of property.  After a bench trial, Taylor was found guilty of theft of property having a value of $1,500.00 or more but less than $20,000.00 and was sentenced to a one-year term of confinement in the State Jail Division of the Texas Department of Criminal Justice.

In his sole point of error on appeal, Taylor claims the evidence is legally insufficient to support his conviction.  Because legally sufficient evidence supports the conviction, we affirm the judgment of the trial court.

## I.    Standard of Review

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of theft beyond a reasonable doubt.  *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305

---

[1]Taylor does business as Taylor's Custom Signs, Taylor Made Signs, and Taylor Sign Company.

[2]Taylor also agreed to do some refurbishing work on two wall signs for Reich.

S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

## II.    Evidence at Trial

On November 5, 2010, Reich paid Taylor $14,657.25, this sum representing one-half of the total cost of four LED signs, together with the construction and wiring of a tenant sign in Kilgore.[3] Two weeks after the November 5 payment, Taylor requested an additional $10,000.00 payment so that the signs, now ostensibly ready for shipment, could be shipped. Reich paid Taylor the additional funds in order to have the signs shipped.[4]

Both Reich and Vicki Yocum, Reich's office manager, believed the signs were shipped on payment of the final $10,000.00 installment. When the signs did not arrive in December, Taylor explained that they were being shipped by boat from China. In response to Yocum's January request for verification of purchase, Taylor provided an invoice indicating that four red, outdoor programmable message signs (model SR-2426) were purchased from Affordable LED, Inc., in Rowland Heights, California, on November 18, 2010, for a total cost of $22,600.00. The invoice is marked "paid in full with credit card."

---

[3]Previously, on November 3, 2010, Reich paid Taylor $1,082.50. This payment represented one-half of the total cost of refurbishing work at the Lock Box.

[4]Specifically, the invoice states, "Need $10,000 for Led sign pick up they have to be PAID N full when pick up." Each of the three checks from Reich to Taylor cleared the bank.

Other evidence regarding the number and type of signs ordered differs from the information reflected on the November 18 invoice. Taylor testified that he ordered a total of four LED signs—to be assembled into two double-sided illuminated signs—one for each location. According to Taylor, only two such signs were ordered from Affordable LED in California on November 18. Two additional signs were ordered from Elite Signs in Houston on November 11. Taylor explained that although he had previously ordered from Elite, he only ordered two signs from them on this occasion because Elite shipments take eight to nine weeks to arrive.[5] Because Affordable LED had a shorter turn-around-time, Taylor ordered two signs from Affordable.[6]

Interestingly, a second invoice from Affordable LED was produced by Taylor at trial. This invoice is dated February 2, 2011. It indicates that four outdoor, programmable message signs (model SR-2426) were ordered, but only two were invoiced at a total cost of $9,470.00.[7] The invoice is stamped "PAID 03/07/2011." Taylor testified that he actually paid this invoice a few days before March 7, 2011, and that he paid Affordable LED a total of $14,000.00 or $15,000.00. It took two weeks for the signs to arrive.

The Elite November 11, 2010, invoice indicates that two LED display signs, costing $11,600.00, were paid for by money order, were to be shipped on January 12, 2011, and were

---

[5]The Elite signs, ordered for the Kilgore location, were smaller than the Lock Box signs due to zoning regulations. These signs were fully colored, while the larger signs were red.

[6]Taylor explained that he did not want to order all four signs from Affordable LED, because he was not familiar with their track record. Although Taylor priced four signs, he testified that he only ordered two from Affordable. Taylor paid a down payment by credit card for these signs.

[7]The invoice indicates that two signs were backordered.

4

scheduled to arrive on January 18, 2011. Taylor testified that he received the Elite signs on January 12, 2011.

By February, when the signs were not installed, Yocum began calling Taylor at least once a week and sometimes more often than that to inquire as to their status. Yocum testified that in late February or early March, Taylor indicated the signs were being shipped by Affordable LED in California. In March, Taylor and his crew delivered boxes, supposedly containing the long-awaited signs, to the Lock Box location. The signs were not installed that day, however, because the job required additional materials. Taylor stored the signs at the Lock Box location per Yocum's request. Yocum testified that she opened one of the boxes, and still has it. Of the equipment it contained, Yocum stated, "It's a hundred-dollar piece from what I've been told."

The third week in March, Taylor returned to the Lock Box location with Pete Gerbine, the manager of East Texas Signs in Longview, to assist with the installation of the LED message board. Taylor was issued a sign permit from the City of Longview on November 22, 2010, for the installation of a commercial sign at the Lock Box. Gerbine discovered, however, that this permit was not sufficient for the installation of an LED message board.[8] Gerbine offered to bring the signs to his shop, obtain the appropriate documentation and permits, and complete some fabrication work on the signs. Because he believed Gerbine was trying to take over his job, Taylor rejected this offer.

---

[8]According to Gerbine, the City will not issue an LED message board permit without the proper documentation from the manufacturer showing the light output and certain settings.

Thereafter, Taylor advised Yocum that he was taking the signs and would install them when he received the proper permit.[9] Believing that Taylor had no intention of ever installing the signs, Reich filed a complaint against Taylor on March 24, 2011, with the district attorney's office.

After the failed attempt to install signage at the Lock Box, Taylor learned from the City of Longview permitting office that information regarding lighting intensity was required for any LED sign permit. Taylor contacted Affordable LED to obtain the necessary information. The following day, Affordable LED provided Taylor with the requested information regarding lighting intensities.[10]

With this information in hand, Taylor completed an LED sign permit application and submitted it to the City of Longview on April 1, 2011. A few days later, Taylor turned himself in to authorities after having learned of a warrant for his arrest for theft in this case. Taylor bonded out the same day and hired an attorney on April 8. On April 27, approximately two weeks after Taylor's arrest, the City of Longview issued the LED sign permit for the Lock Box.[11] Taylor never installed any of the four LED signs.[12]

---

[9]According to Yocum, Taylor told her that he was taking the signs to the City of Longview to have permits issued. The Affordable LED signs were never installed or returned to the property. If the signs would have been completed and the work done, Taylor would have been due another $4,600.00. Taylor did not request additional money after the $10,000.00 was paid.

[10]The email discusses lighting intensities for a single color LED programmable sign, model #SR-2426. The invoice from Affordable LED dated February 2, 2011, lists the same item—#SR-2426.

[11]Defense exhibits 10–15 are photographs of the LED signs that were never installed. The smaller Elite signs were ordered for the Kilgore location. The four LED signs were in Taylor's possession prior to his arrest and remained in his possession at the time of trial.

6

Even so, there is no dispute that Taylor did complete some of the agreed-to work. Taylor obtained a permit for installation of the multi-tenant monument sign in Kilgore on November 23, 2010, and at some point thereafter, constructed and installed that sign. In spite of this effort, the job was not properly completed because Taylor failed to run electricity to the sign. Reich had to pay an electrician to revamp the lighting and finish hooking up the electricity.[13]

Taylor also obtained a sign permit from the City of Longview in November 2010. Pursuant to this permit, Taylor removed the old pole sign at the Lock Box and installed a new one in its place.[14] He dug a line from the sign to the building for the electrical wires, although the wiring was not installed. Taylor apparently delivered signage to the Lock Box on two

---

[12]In addition to evidence relating to the offense in question, the State introduced the testimony of four witnesses concerning problems they experienced with Taylor and his work. Cathy Lee, the owner of a coffee shop in Liberty City, testified that she hired Taylor to install a non-illuminated sign at her shop on September 3, 2008. Lee paid one-half of the sign cost up front and was told the sign would be installed within two weeks. When the sign was not timely installed, Lee contacted Taylor, who indicated on more than one occasion that the sign would be ready the following week. Approximately six months later, Taylor installed the sign on a Sunday evening before she had the opportunity to inspect it. The sign was improperly secured and the font was not what Lee ordered. Taylor assured Lee he would correct these problems, but he failed to do so.

James Randall Arrendell contacted Taylor in May 2009 to install an illuminated sign at his business by August of that year. Arrendell paid Taylor the full price prior to installation. Taylor installed the sign, but did not complete the necessary electrical work. After "[p]robably a hundred" requests to complete work on the sign, Arendall was forced to hire another sign contractor to complete the work.

Dorris Wallace, owner of the Village Shopping Center in Hallsville, hired Taylor to install a double-faced illuminated sign at the shopping center. Wallace paid one-half of the installation price up front, but the sign was never completed. Taylor poured concrete for the sign base, but the concrete forms collapsed, leaving an unsightly cement "blob." Taylor planned on bricking around the concrete to make it look good. Unfortunately, the concrete for the sign was placed on the State's right-of-way and had to be removed by a third party at additional cost to Wallace. Taylor made a number of excuses and promises to deliver the sign, but never did so and never refunded Wallace's money.

Tucker Woods' chiropractic office was located in Wallace's shopping center. Woods hired Taylor to install a sign for his business in February 2010. The sign was to be in place prior to May of that year. Woods paid one-half of the sign cost up front and paid the balance in May or June, but the sign was never installed. Taylor offered many and various reasons why the sign was not finished.

[13]Although the testimony is not entirely clear on this issue, it is apparent that the LED signs ordered for the Kilgore location were never installed.
[14]The LED portion of the sign was not installed.

different occasions (both in March) and attempted to install the signage the third week in March. This attempt was foreclosed when Taylor realized or discovered he did not have an adequate permit for the LED sign. Taylor testified that he ordered and received four LED signs per the parties' agreement, and was in possession of those signs at the time of his arrest.[15]

### III. The Evidence is Legally Sufficient to Support the Conviction

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

In order to prove Taylor committed theft, the State had the burden to establish that Taylor (1) with intent to deprive the owner (Reich Builders) of property,[16] (2) unlawfully appropriated property, (3) without the effective consent of the owner. TEX. PENAL CODE ANN. § 31.03 (West Supp. 2013); *Ehrhardt v. State*, 334 S.W.3d 849, 852 (Tex. App.—Texarkana 2011, pet. ref'd).

---

[15]Additionally, Taylor did some painting work at the Lock Box.

[16]"Deprive" means,

      (A)    to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner;

      (B)    to restore property only upon payment of reward or other compensation; or

      (C)    to dispose of property in a manner that makes recovery of the property by the owner unlikely.

TEX. PENAL CODE ANN. § 31.01(2)(A), (B), (C) (West Supp. 2013).

Appropriation is unlawful when it is without the owner's effective consent. TEX. PENAL CODE ANN. § 31.03(a), (b)(1) (West Supp. 2012); *McClain v. State*, 687 S.W.2d 350, 353 n.7 (Tex. Crim. App. 1985). To appropriate means any exercise of control over the property in question. *McClain*, 687 S.W.2d 353 n.7. Consent is ineffective if "induced by deception." TEX. PENAL CODE ANN. § 31.01(3)(A) (West Supp. 2012); *Ehrhardt*, 334 S.W.3d at 853 (to "induce" means to "bring about, produce, or cause").

Here, the theft is alleged to have occurred in connection with a contract. Such a claim "requires proof of more than an intent to deprive the owner of property and subsequent appropriation of the property . . . . The State must prove that the appropriation was a result of false pretext, or fraud." *Wirth v. State*, 361 S.W.3d 694, 697 (Tex. Crim. App. 2012). The mere failure to perform a contract is not sufficient to establish guilt of theft. *Phillips v. State*, 640 S.W.2d 293, 294 (Tex. Crim. App. [Panel Op.] 1982). Likewise, the failure "'to return or pay back money after failing to perform a contract, for the performance of which the money was paid in advance'" is not sufficient to establish guilt of theft. *Ehrhardt*, 334 S.W.3d at 853–54; *Phares v. State*, 301 S.W.3d 348, 352 (Tex. App.—Beaumont 2009, pet. ref'd) (quoting *Cox v. State*, 658 S.W.2d 668, 671 (Tex. App.—Dallas 1983, pet. ref'd)). "[U]nder the terms of [a contract] individuals typically have the right to 'deprive the owner of property,' albeit in return for consideration." *Baker v. State*, 986 S.W.2d 271, 274 (Tex. App.—Texarkana 1998, pet. ref'd). Our inquiry is thus focused on whether Taylor unlawfully deprived Reich of property. *See Ehrhardt*, 334 S.W.3d at 853–54.

If one looks at all of the dealings between Taylor and Reich as being a single, unitary transaction, it appears that Taylor's actions are simply an example of monumental ineptitude in business which do not rise to the level of criminal activity. However, there is at least one instance during the continuing transaction that stands out, that being the one which took place on or about November 18, 2010, wherein Taylor represented that it was necessary for Reich to pay $10,000.00 in order to have the signs shipped. The fact-finder could certainly conclude, based on that evidence, that such representation was false and that it was upon this false representation that Reich paid Taylor $10,000.00.

Although Taylor maintains that because this payment (made two weeks after the overall agreement for the installation of the sign was reached) was within the parameters of the agreed-upon price for the signs and was paid at a time when shipping was expected, criminal intent is negated. That is not necessarily so. This ignores the fact that the payment by Reich was made on reliance upon a false representation.

While we agree with Taylor that the entire chain of events does not evidence the intent, at the time the contract was formed, to unlawfully deprive Reich of its funds, a false representation made by Taylor to induce Reich to make the $10,000.00 payment referenced above is legally sufficient evidence supporting a finding of unlawful appropriation, the basis for the claim of theft.

Based on this evidence, the fact-finder could have reasonably believed that Taylor induced Reich to make a $10,000.00 payment within two weeks of the November 5 down payment by falsely representing that the signs were ready for shipment when they were not.

10

We distinguish this case from the *Ehrhardt* case to which reference is made above. In *Ehrhardt*, we determined that the defendant there had certainly been remiss in his business practices but had not committed a crime. We point out that although Ehrhardt had lied to the person with whom he had contracted to build, the other person to that contract testified that none of the payments of money made by her were made in reliance upon those misrepresentations. The case before us is more similar to *Higginbotham v. State*, 356 S.W.3d 584 (Tex. App.—Texarkana 2011, pet. ref'd), wherein Higginbotham, the defendant, had used deception to induce the person with whom he had a contract to make one or more specific payments. In *Higginbotham*, we ruled that consent which is "induced by deception is ineffective." *Id.* at 590.

There is some evidence to support the finding of the trial court.

## IV. Conclusion

For the reasons stated, we affirm the judgment of the trial court.


Bailey C. Moseley
Justice


## DISSENTING OPINION

I agree with the majority's conclusion that a reasonable fact-finder could have believed that Taylor induced Reich to make a $10,000.00 payment by falsely representing that the signs were ready for shipment when they were not. However, it does not necessarily follow that theft was committed. The contract in this case required a down payment of $14,657.25, with an

11

additional $10,000.00 payment to follow at the time of pick up. Although the time of pick up may have been misrepresented, the signs were eventually shipped and received by Taylor. This case is thus distinguished from *Higginbotham v. State*, 356 S.W.3d 584 (Tex. App.—Texarkana 2011, pet. ref'd).[17]

In *Baker v. State*, 986 S.W.2d 271 (Tex. App.—Texarkana 1998, pet. ref'd), this Court acknowledged that if a contract is partially or substantially performed, as here,[18] intent to commit theft through criminal fraud or deception is not shown by the evidence. *Id.* at 274–75; *see also Lopez v. State*, 316 S.W.3d 669, 676 (Tex. App.—Eastland 2010, no pet.). When, however, there is specific proof that funds paid for a project were not used for the project, an exception exists. *Baker*, 986 S.W.2d at 275.

In that case, Baker acted as a general contractor to build a house for James. Baker was added as a signatory to James' checking account, opened for the purpose of holding the funds needed to build James' new home. Baker wrote various checks to pay for construction work, two of which were made out to cash with the notation that they were to be used for a particular purpose. Even though there was undisputed evidence that Baker performed a substantial portion

---

[17]In that case, Higginbotham contracted to construct a log home for Huff for $228,919.00. In connection with this contract, Higginbotham submitted a bill to Huff for cabinets in the amount of $9,280.00. Higginbotham never paid for the cabinets. Huff, therefore, paid the cabinet subcontractor directly. Higginbotham testified that he and Huff subsequently agreed to apply the cabinet draw to other expenses. *Higginbotham*, 356 S.W.3d at 589. Huff denied having agreed to apply the cabinet down payment to other expenses. *Id.* at 590. We concluded that a rational juror could have believed Huff's testimony over Higginbotham's testimony. *Id.*

[18]Here, the contract was at least partially performed. Taylor completed various aspects of the agreed-to work: he obtained a permit for the installation of the multi-tenant monument sign; he constructed and installed the multi-tenant monument sign; he obtained a permit for renovation of the sign at the Lock Box; he removed the old pole sign at the Lock Box and installed a new one in its place; he performed painting work at the Lock Box; he delivered signage to the Lock Box on two different occasions, although it was never installed; he ordered and received four LED signs which he still had at the time of trial; and, he applied for and received an LED sign permit from the City of Longview.

12

of the overall work on the house, there was evidence that Baker took some of the funds for his own benefit and fraudulently concealed that those funds were not used for purposes of the contract.[19] Based on this proof, this Court determined that the evidence was sufficient to support Baker's theft conviction.

In light of *Baker*, it is appropriate to analyze the record to determine whether there is specific proof that any of the funds paid to Taylor were diverted from the project. In this case, unlike *Baker*, there is no such evidence.

At Yocum's insistence, Taylor produced an invoice in January showing that four LED signs were ordered from Affordable LED at a cost of $22,600.00. A handwritten notation on this invoice indicates that the signs were paid in full by credit card. The credit card number was written on the invoice. Yocum testified, "As a business person I know that that doesn't happen. So that caught my attention and it made me question the whole thing." The veracity of this invoice is further impugned by Taylor's own testimony that he only ordered two signs from Affordable LED. Taylor never attempted to explain the initial invoice from Affordable, why four LED signs were not timely received pursuant to this supposedly fully paid invoice, and why a second order was placed with Affordable for additional LED signs in February 2011. A reasonable fact-finder could conclude, from this evidence, that the November 18 invoice from Affordable was not "paid in full" and was, in fact, bogus.

---

[19]The initial check, in the amount of $4,800.00, included a notation that it was to be utilized for the concrete slab. The second check, in the amount of $1,150.00, included a notation that it was to be utilized for rough-in plumbing. *Baker*, 986 S.W.2d at 275. James testified that Baker did nothing toward the concrete work personally and that she wrote a check directly to the concrete contractor. Baker refused to furnish an invoice for the concrete work. The plumber testified that he received no cash in connection with his work and that he only received one check from James that did not cover the total cost of his work. *Id.*

The second invoice from Affordable LED in February 2011 shows an amount due of $9,470.00 for two LED signs. This invoice is stamped "PAID 03/07/2011." The invoice from Elite Signs indicating a cost of $11,600.00 for two LED signs reflects payment by money order. These sums total $21,070.00. After the initial down payment of $14,657.25, the balance on the total cost of the signs amounts to $6,412.75. Yet, Taylor was paid an additional $10,000.00, the full extent of which was not needed to satisfy this balance. The remaining $3,587.25 could not have been used to pay for LED signs.[20]

Even though a reasonable fact-finder could determine that the excess funds were not used to purchase LED signs, there is no proof that this money was diverted from the project. The invoice lists three specific projects: (1) the purchase of four LED signs, (2) the installation of a 6' x 8' tenant sign in Kilgore, and (3) the installation of wire for the tenant sign. The evidence is undisputed that Taylor installed the tenant sign at the Kilgore location. Taylor did not, however, complete the wiring for this sign. The invoice lists the tenant sign cost as $3,750.00 and the cost of wire for that sign as $1,100.00. The money paid to Taylor, over and above the sign cost of $3,587.25, closely approximates the amount due Taylor for construction of the tenant sign at the Kilgore location.

This case involved a contract which specifically required Reich to pay Taylor $10,000.00 before the signs could be shipped. While this money was probably paid prematurely, there is no evidence it was diverted from the project. Taylor spent at least $6,412.75 of this sum (in addition to the initial payment of $14,657.25) on purchasing LED signs pursuant to the contract.

---

[20]This amount was not profit to Taylor, as the invoice specifically provides that Taylor was to receive $4,657.00 when the signs were "up & finished." This amount was never paid.

The contract required a payment of $3,750.00 to Taylor for construction of the tenant sign at the Kilgore location.  Reich never contended Taylor was not due these funds, and there is no dispute this work was performed.  Because there is no evidence that any funds were diverted from the project, I would find the evidence insufficient to support the conviction.


Jack Carter
Justice

Date Submitted:    October 29, 2013
Date Decided:      December 13, 2013

Publish

15