

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-11-00255-CR
_____

GUADALUPE RAMIREZ, III, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 196th Judicial District Court
Hunt County, Texas
Trial Court No. 26968

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

The hopes of patrons at Bonnie Lou's Game Room in Hunt County that they might have a lucky night at the establishment's gaming slots were shattered shortly before midnight by a violent robbery by three men wearing bandanas and hoodies. The three robbers inside the building were described by various witnesses as "African-American," "colored," or "dark complected, black"; as including one who "looked like he was black"; or as including two African-Americans and one Caucasian.

Guadalupe Ramirez, III, who is Hispanic, has been convicted by a jury of aggravated robbery with a deadly weapon.[1] On appeal,[2] Ramirez argues that the evidence was insufficient to convict him and that "there was insufficient notice to increase the appellant's punishment."[3] We affirm the trial court's judgment because we find that (1) legally sufficient evidence establishes that Ramirez committed aggravated robbery with a deadly weapon and (2) sufficient notice was given to enhance Ramirez' punishment.

---

[1]Ramirez pled true to the State's enhancement paragraph and received an enhanced sentence of fifty years' imprisonment.

[2]Ramirez also appeals from the following convictions entered on the same date: aggravated assault against a public servant (cause number 06-11-00251-CR); aggravated assault of Virginia Green with a deadly weapon (cause number 06-11-00252-CR); aggravated assault of Joanna Brock with a deadly weapon (cause number 06-11-00253-CR); and aggravated assault of Darlene Moffitt Robinson with a deadly weapon (cause number 06-11-00254-CR). These cases were all consolidated for trial. Ramirez has filed a single brief challenging the legal sufficiency of the evidence supporting each conviction.

[3]In a separate point of error, Ramirez argues that the trial court erred in overruling his motion for directed verdict. In reviewing the denial of a directed verdict, we look to the legal sufficiency of the evidence. *Williams v. State*, 356 S.W.3d 508, 522–23 (Tex. App.—Texarkana 2011, pet. ref'd); *Todd v. State*, 242 S.W.3d 126, 136 (Tex. App.—Texarkana 2007, pet. ref'd).

*(1)*     *Legally Sufficient Evidence Establishes that Ramirez Committed Aggravated Robbery with a Deadly Weapon*

Fifty or sixty patrons were at Bonnie Lou's Game Room when the robbery occurred. Employee Shelbie Crisp testified that three "colored" men wearing bandanas and hoodies burst in through the only entrance, "immediately shot into the ceiling[,] and told us to get on the floor." Crisp clung to the ground next to customers as the three men "branched out" and began shouting commands, confiscating cell phones, and "being violent." She saw that two of the robbers had guns and identified the colors of the three hoodies as gray, black, and red. She believed that the man who fired the shot was wearing a red bandana.

Patron Virginia Green[4] was standing outside of the game room talking to her nephew on her cell phone when she "felt a push," "went flying through the door onto the floor[,] and slid across the carpet." She looked up and saw what she described as "three" "dark complected, black" men. All three men were carrying guns and wearing bandanas and hoodies.[5] One gunman grabbed her cell phone and her purse, and all three were "all over the place" "yelling and screaming and saying, you know, we're in charge of this. If you move, we'll shoot you." Virginia testified, "I thought I was going to die." She had a carpet burn on her arm and a "big bruise" on her hip. Virginia complied with the gunmen's requests and remained on the floor.

---

[4]Because another witness has the same last name, we will refer to both Greens by their first names, Virginia and Theresa.

[5]Virginia testified that the man who pushed her was wearing a multi-colored bandana and a gray hoodie.

3

Seventy-two-year-old Vincenta Luna Ramirez[6] saw the three men enter the game room. She testified that an African-American man "shoots a gun and hits me in the back with a fist in between my lungs and throws me to the floor." Vincenta stated that the man "pulled me all the way to the back, and my knees, . . . [and] elbow . . . had carpet burns." Vincenta testified that the man said, "I want your money" and that she then "threw her purse at him." She testified, "I thought at my age, I was going to die like that."

Andrew Collins recounted the event this way. Collins was at the game room with his wife, Linda, when an "African-American" man wearing a gray hoodie and a white or gray bandana came "though the door pushing people down, shot a gun in the air" and told "everybody to get down on the floor," and give up their "cell phones and money." Another man who "looked like he was black" was "yelling also for people to get on the ground and give up cell phones." According to Collins, there were three men, and two were carrying guns.[7] Collins "could hear them kicking and hitting other people," and he became concerned for his wife's safety. He testified, "I figured I was going to see if they were going to find" his wife. As Collins was looking for her, one of the men "raised" him "from behind and put a gun to [his] head." Collins "knocked" the gun away and was struck three times with the gun. He testified that the man "[h]it [him] on the top of the head," "on the side of the head," and "in the neck" before shoving him back on the ground. Collins' head was "sore," he was bleeding, and he would later

---

[6]We will use her first name since she has the same name as one of the appellants.

[7]Collins testified that another man was wearing a dark hoodie and a blue or black bandana.

require hospital treatment.  The gunmen took his cigarettes and lighter and moved on.  Collins testified that three other people were assaulted.

Witness Theresa Green testified that the robbers were three "African-American" men, and that one of them stood over her and asked her for a cell phone.  Green stated that after she told the robber she did not have a cell phone, "[h]e kicked me in the ribs and pointed the gun in my dad's face and grabbed my mom's cell phone.  She had $20 in her hand, and he grabbed the $20 from my mom's hand.  And then he was walking around getting everyone's cell phone."  Based on her experiences that night, Theresa believed the three robbers were working together.

Darlene Robinson was lying on the floor of the game room with her sister, Joanna Brock.  She believed that, of the three perpetrators, two were African-American, and one was Caucasian.  Robinson also thought that only one man was carrying a gun.  She used her cell phone to dial 9-1-1 as the robbers were spreading out and yelling commands.  She testified,

> [t]he guy up front was  --  kept hollering, everybody get up here.  And my sister and I raised our heads up to look at him to see if we were supposed to move from where we were.  And as we raised our head [sic] up, they came up from behind, came up from behind us on the aisle and hit me on the head and hit her on the head [with a gun].

Robinson was scared and knew "[t]here was a possibility we could get killed."  Robinson was worried for her sister because Brock "was bleeding all over the place."

Brock was terrified.  Like her sister, Brock dialed 9-1-1 and allowed the dispatcher to listen to the events unfolding at the game room.  She remembered "a man in a dark blue hoodie kicking some man at the end of the aisle."  She testified that she was hit "from the back" and did not see the man who hit her.  Brock testified that the blow "[s]plit [her] head open," causing her

5

to pass out. Her next memory of the incident was "[c]oming to in a pool of blood" after the robbers fled. She was later hospitalized.

After the patrons had been satisfactorily subdued, the robbers "asked who worked there in order to get in the safe," and Crisp "stood up and let them know that that was me." She recalled, "The one that had the red bandana on, he came up behind me and was shoving me, physically pushing me towards the counter." Theresa testified that a man "grabbed [Crisp] by the head of the hair and was pushing her back there behind the counter." The other two men joined the third man "behind the counter," and Crisp "opened the safe." Crisp testified that she had about $1,000.00 or $1,200.00 in her apron, that the safe had "about $4,500, give or take 500," and that the men put the money in plastic grocery sacks.

After handing over the money, Crisp was "afraid of being shot," and turned her "back towards where they were standing . . . because I didn't want them to think that I was . . . trying to eye them or anything." Crisp heard the men walk out of the game room. She testified, "[M]aybe ten seconds later, the one with the red bandana[8] came back in and proceeded to demand more money from me and use foul language and cursed, and I just said I don't have any more money . . . And he ran back out." He was carrying a gun.

Crisp testified that, after the men left, "everyone started . . . slowly getting up off the floor. And we could -- we could see that there were several people that had been injured. There was blood everywhere, and we had people, several people . . . calling 911." Theresa testified,

---

[8]Collins believed the man that came back inside was wearing a gray hoodie and an off-white bandana. Theresa testified that the man was wearing a red bandana.

"As soon as the guy at the door took off running out the door, I got up and ran out the door right behind him." She was less than two feet from the getaway car and able to provide a description to law enforcement. Collins also went to the door to "see what they were driving." He testified that he "saw a silver car pulling out of the parking lot."

Hunt County Deputy Sheriff David Arndt testified that "several people [were] calling 911, screaming and asking for help." He was the first to arrive at the game room after the robbers had left. Arndt stated that several "excited and scared" people "were all coming up to me screaming" in the parking lot. He observed, "[O]ne or two people outside that had injuries" including a lady that "had been hit . . . on the back of the head and was bleeding." He quickly obtained suspect and vehicle descriptions and called it into dispatch. He concluded that the suspects were "black" males.

Officer Joseph Fernandez, who was already en route to the game room, was told the vehicle's description and direction of travel. He quickly turned around and encountered a silver vehicle matching the description with three people inside. He notified Arndt that he had "caught up" with the vehicle. Arndt testified that he did not enter the game room "until after Deputy Fernandez had already gotten behind the vehicle with the suspects." Arndt testified that when he got inside, he saw "some people were on the floor. Some people were sitting in the chairs that had been hit in the head. I noticed there was blood on the carpet where some people had sustained injuries." He described "two bullet holes in the ceiling just above the doorway." Paramedics were called to assist the victims. In speaking with witnesses, Arndt concluded that "[s]everal cell phones," cash, a recording device, and Wal-Mart gift cards were missing. He

7

testified, "Several people stated that everybody had a firearm, and some stated that . . . it might have just been one or two."

Officer Jeffrey Reese testified that he saw Fernandez' patrol unit chasing the suspect vehicle "with his lights activated." He testified, "[T]hey had already came [sic] to a stop at the intersection of 276 and 34. I heard gunshots at that time and proceeded up in the intersection. And as I approached the intersection, I saw the deputy running to his vehicle."

As Fernandez was chasing the suspects, he noticed "that they were talking to each other, kind of . . . panicking." Fernandez testified that, after the vehicle stopped at the intersection:

> The passenger, front passenger of the vehicle jumped out of the vehicle -- jumped out and shot. Before he jumped out, I had opened my car door. . . . It was a black male.
>
> The only thing I remember is blue gloves, and he had a bag in his hand. And as he jumped out, he was coming back towards my vehicle, and immediately, as soon as he turned around towards my vehicle, he pointed his arm up at me, and there -- I think what appeared to be a gun and opened fire.
>
> I dove from my vehicle, stepping out. I think I remember shooting one round . . . but he continued shooting at me. I crawled on my hands and knees to the back of my car . . . . The car was still in drive because I didn't have time to put it in park.
>
> I turned over and sat on my butt, and immediately thinking he was right behind me; he wasn't . . . . [M]y taillights were glaring on an object that appeared to be a man walking towards me with a gun pointed at my head.
>
> I lifted my arm and shot until he collapsed. And then I waited until he was -- until what I thought he was subdued.

Fernandez testified that the shooter, an African-American male later identified as Vincent Thomas, had a bag of money and a Winchester .380 caliber gun. Thomas was killed by

8

Fernandez' bullets. Concerned that the other passengers in the car could have weapons, Fernandez "got up and chased the car, the suspect car, and shot at the car." It sped off.

Reese saw the "small sedan turn and go towards Greenville." He followed the suspect vehicle at "94 miles an hour" with lights and sirens activated. Another unit, driven by Officer David Wilson, joined the chase. Eventually, Trooper Jay E. Simpson "deployed stop sticks" that "punched" the tires of the suspects' vehicle. The vehicle came to a stop after a few miles, and Reese commanded the occupants to exit the vehicle.

Simpson identified Ramirez as the driver. He believed Ramirez was on PCP and very intoxicated and "scary." Ramirez was also experiencing seizures. Wilson testified that the other passenger was an African-American male named Darius Williams.[9] According to Wilson, both suspects needed medical attention even though they had not sustained any visual injuries. Hospital test results revealed that Ramirez had alcohol, PCP, cocaine, and an opiate in his system. His blood alcohol level was ".09, plus or minus .01." At the time of death, Thomas also had alcohol, PCP, Hydrocodone (an opiate), and marihuana in his system. Thomas was wearing a gray sweatshirt, black sweatpants, and a red bandana.

Detective Tommy Grandfield testified that they confiscated $5,143.00 from Thomas' bag and $430.00 from his shoe. Simpson testified that there were reports of "items that possibly could have been thrown out of the vehicle." He "went back to that location" and was "just looking along the side of the road" to see if there were items that were thrown out. Simpson recovered red and black hoodies and a black undershirt approximately five miles from the

---

[9]Reese testified that the driver was Hispanic and that the passenger was an African-American male.

intersection of "276 and 34." Three cell phones and a pocket knife were removed from the suspects' vehicle, which was registered to Thomas' girlfriend, Carla Thornton. At trial, Theresa testified that Thornton's vehicle was the one she saw pulling out of the game room parking lot.

Ramirez has a different version of the events. Ramirez met Thomas in prison.[10] On the day of the robbery, Ramirez was transported by Thornton's son to a party at Thomas' house. Thomas, Williams, and "two other black dudes" known as "Buck" and "Cockalocka" were present. Ramirez smoked PCP, drank, and inhaled cocaine. Thomas became "real aggravated," Cockalocka became upset and left with "Buck." Ramirez thought "the PCP had [Thomas]." He asked for a ride home and Thomas and Williams eventually agreed to drop him off. Ramirez sat in the backseat.

Williams asked Ramirez if he had money and suggested that they should go play slots at the game room. Ramirez told the jury that he "was drunk and throwing up" and "fell asleep on the way" to the game room. He claimed, "[W]hen I woke up again, I heard a door slam in the car, and a pistol was produced in my face. They told me to get my fat ass up in the front seat and drive the car and give . . . [them] my cell phone." Ramirez complied.[11]

The keys were already in the ignition. Ramirez said that Thomas hit him in the head with the pistol and threatened his life if he stopped driving. He claimed that, when he stopped at the intersection of "276 and 34," he had no idea that Thomas was going to get out and shoot at Fernandez. He testified that he continued driving because Fernandez was shooting at the car.

_____

[10]Ramirez was previously convicted of aggravated assault with a deadly weapon.

[11]Theresa, who saw the vehicle in which the three perpetrators left the scene, did not testify to any changing of seats by the three in the car or of any delay in their departure.

10

Ramirez told the jury that he did not conspire with anyone to rob the game room. He admitted that he did not tell anyone that he had been hit in the head and claimed to be wearing only a "muscle shirt underneath and a pair of jeans" on that February day. When asked what other third person could have robbed the game room besides Thomas and Williams, Ramirez responded, "[I]t was other people that -- that could've been there."

Rejecting Ramirez' testimony, the jury convicted him of aggravated robbery with a deadly weapon.

In evaluating legal sufficiency, we review all of the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of aggravated robbery with a deadly weapon beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while keeping in mind that the credibility of witnesses is the sole province of the jury, and that we "must give deference to 'the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Jackson* 443 U.S. at 318–19); *see Ehrhardt v. State*, 334 S.W.3d 849, 857 (Tex. App.—Texarkana 2011, pet. ref'd).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

The indictment in this case alleged that Ramirez, individually and acting together with Williams, intentionally or knowingly took $5,527.00 belonging to Crisp without her consent, with intent to deprive her of the property, while placing her in fear of imminent bodily injury through the use or exhibition of a firearm. Ramirez individually committed the offense of aggravated robbery with a deadly weapon if (a) while in the course of unlawfully appropriating property (b) without Crisp's consent (c) with the intent to deprive her of the property (d) Ramirez (e) intentionally or knowingly (f) threatened or placed Crisp in fear of bodily injury or death (g) while using or exhibiting a deadly weapon. TEX. PENAL CODE ANN. §§ 20.02(a)(2), 29.03(a)(2), 31.03(a), (b)(1) (West 2011). A "deadly weapon" is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (West Supp. 2012).

Under the law of the parties, "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a) (West 2011). "A person is criminally responsible for an offense committed by the conduct of another if[,] . . . acting

12

with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011). Thus, Ramirez committed aggravated robbery with a deadly weapon as a party if he acted with intent to promote or assist Williams in the commission of the offense by encouraging, aiding, or attempting to aid him in the aggravated robbery of Crisp with a firearm.

The evidence was sufficient to convict Ramirez if he was physically present at the commission of the offense and encouraged its commission by words or other agreement. *Hartsfield*, 305 S.W.3d at 864 (citing *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994) (op. on reh'g)). In determining whether the accused participated as a party, the fact-finder may "look to the events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to the prohibited act." *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994) (op. on reh'g) (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)); *see King v. State*, 29 S.W.3d 556, 564 (Tex. Crim. App. 2000); *Hartsfield*, 305 S.W.3d at 864.

Ramirez focuses on the element of identity. He complains that he is "Hispanic and cannot be mistaken for African-American or 'colored.' Thus there is a failure of proof of identity." However, Crisp's use of the term "colored," without a specification as to the robbers' race, did not exclude Ramirez as a possible suspect, and Robinson's testimony that she believed one of the robbers to be Caucasian suggested that one of the perpetrators may not have been African-American. Aside from the conflicting testimony of the race of the three men who

13

robbed the game room, ample evidence existed for the jury to find that Ramirez was one of the three men.

By Ramirez' own admission, he was with Williams and Thomas as they drove the silver sedan to the game room. No one else was in the car at that time, and they had just come from a party. Witnesses testified that they saw three men enter the game room and begin shouting demands. Together, the three men subdued the game room's patrons through threats and violence. Most witnesses, including Crisp, testified that they saw two men each carrying a gun. Theresa testified that she believed all three men were working together. Crisp testified that one of them physically pushed her behind the counter and that all three men stood over her as she opened the safe and gave them the money. Theresa ran out after the men as they left the game room. By Ramirez' own admission, he drove the getaway car, which contained only Thomas and Williams as passengers. There was no testimony from either Theresa or Ramirez that some other person was seen leaving the game room or was in or around the car.

The video recording from Fernandez' patrol unit demonstrated that Ramirez continued to drive the car even as he was being chased by Fernandez. Fernandez testified that he saw the three men talking to each other and appeared to be panicking. The video recording shows that Ramirez initiated the vehicle's right blinker at the intersection. Instead of turning, he stopped at the intersection for only seven or eight seconds—just enough time to let Thomas out of the vehicle with a gun in hand so that he could shoot at Fernandez. Ramirez did not exit the vehicle. He continued to flee even though the passenger-side door was open. Although Ramirez claimed

that Thomas was the ringleader of the pack, he drove the car for several miles before spike strips were deployed and continued to drive the car on punctured tires until it came to a stop.

The witnesses testified that the robbers were wearing bandanas and sweatshirts. Thomas had his sweatshirt and bandana when he exited the vehicle. Ramirez, however, was found wearing only an undershirt on his upper torso, even though it was a February night. Based on reports that items had been thrown from the getaway car, Simpson combed the pathway of the chase and recovered red and black hoodies and a black undershirt. Considering that Crisp had testified that one of the robbers was wearing a red-colored hoodie, the jury was free to conclude that Ramirez threw these items from the car. As the trier of fact and sole judge of the credibility of the witnesses and the weight of the evidence, the jury was free to disregard Ramirez' self-serving testimony tending to suggest that he was an unwilling participant in the crime.[12] *Hartsfield*, 305 S.W.3d at 869 (citing *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999)).

At a minimum, the jury could have found, even if Thomas was the principal and mastermind of the robbery, that Ramirez encouraged, aided, or attempted to aid in the aggravated robbery. Specifically, there was evidence from which the jury could have found that Ramirez aided Thomas to (a) unlawfully appropriate $5,527.00 from Crisp (b) without Crisp's consent (c) with the intent to deprive her of the money and that Ramirez aided Thomas in

---

[12]Although he claimed that he drove the car under duress, the jury was free to reject Ramirez' testimony. It is well established that evidence of an appellant's participation as driver of the getaway car is legally sufficient. *See Gerzin v. State*, 447 S.W.2d 925, 926 (Tex. Crim. App. 1969); *Davila v. State*, 388 S.W.2d 944, 945 (Tex. Crim. App. 1965); *Stewart v. State*, 652 S.W.2d 496, 500 (Tex. App.—Houston [1st Dist.] 1983, no pet.).

15

(d) intentionally or knowingly (e) threatening or placing Crisp in fear of bodily injury or death (f) while Thomas was using or exhibiting a deadly weapon.

Accordingly, we find the evidence sufficient to support Ramirez' conviction. This point of error is overruled.

*(2)    Sufficient Notice Was Given to Enhance Ramirez' Punishment*

Ramirez complains that the indictment in this cause did not include an enhancement allegation. "[P]rior convictions used as enhancements must be pled in some form, but they need not be pled in the indictment." *Brooks v. State*, 957 S.W.2d 30, 34 (Tex. Crim. App. 1997); *see Villescas v. State*, 189 S.W.3d 290, 292–95 (Tex. Crim. App. 2006). Ramirez argues "there is no other form of written notice seeking enhanced punishment as to this cause number found anywhere in the appellate record of this cause." The record demonstrates otherwise. A supplemental clerk's record shows that the State provided notice to Ramirez' counsel that it was going to use Ramirez' prior felony conviction to enhance the level of punishment in this cause. The notice was provided approximately one month before trial.[13]

We overrule this point of error because the State provided notice of its intent to enhance Ramirez' punishment in this case.

---

[13]There is no suggestion that this notice was untimely and/or inadequate. *See* TEX. CODE CRIM. PROC. ANN. art. 28.10 (West 2006).

16

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:       November 7, 2012
Date Decided:        November 27, 2012

Do Not Publish