

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0051-14

**HENRY TAYLOR, JR., Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SIXTH COURT OF APPEALS
### GREGG COUNTY

PRICE, J., delivered the opinion of the Court in which MEYERS, WOMACK, KEASLER, HERVEY, COCHRAN and ALCALA, JJ., joined. KELLER, P.J., concurred in the result. JOHNSON, J., filed a dissenting opinion.

## O P I N I O N

The appellant in this case argues that he was convicted of theft solely because his apparent "ineptitude" prevented him from adequately fulfilling his contractual obligations. In a published split decision, the Sixth Court of Appeals affirmed the appellant's conviction for theft in an amount between $1,500 and $20,000, a state-jail felony.[1] The majority found

---

[1] *Taylor v. State*, ___ S.W.3d ___, No. 06-13-00078-CR, 2013 WL 6516399 (Tex. App.—Texarkana Dec. 13, 2013).

that the evidence would support a rational inference that, by the time the appellant took a second installment payment on the contract in the amount of $10,000, on a false premise, he had formulated the requisite intent to deprive his customer of that amount.[2] The dissent argued that the evidence, while certainly sufficient to support the inference that the money was taken under false pretenses, was insufficient to show that the appellant ever intended to renege on the contract.[3] In light of this disagreement among the justices below,[4] we granted the appellant's petition for discretionary review and now affirm the court of appeals's judgment.

## FACTS AND PROCEDURAL POSTURE

### In the Trial Court

The indictment alleged that, "on or about the 30th day of November, 2010," the appellant unlawfully appropriated $1,500 to $20,000 from "J. Reich" without his effective consent and with intent to deprive him of it.[5] The appellant waived a jury, and the trial judge heard the following evidence.

---

[2] *Id*. at *4-5.

[3] *Id*. at *5-6.

[4] TEX. R. APP. P. 66.3(e).

[5] The State thus bound itself to prove that the appellant unlawfully appropriated the money from Reich at any time before the presentment of the indictment to the grand jury but not so remotely that prosecution would be barred by the statute of limitations. *Thomas v. State*, ___ S.W.3d ___, No. PD-1326-13, 2014 WL 5154586, at *4 (Tex. Crim. App. Sept. 24, 2014).

Jeff Reich owned a construction company in Longview, and he also owned certain commercial properties in Longview and Kilgore. For several years, Reich had done business with the appellant and the appellant's father, who ran several commercial sign businesses,[6] and Reich had been satisfied with their work. But sometime in 2009, Henry Taylor, Sr., "stepped out," and the appellant took over the businesses. Through Reich's office manager, Vicki Yocum, the appellant negotiated a deal on November 4, 2010, by which he agreed to order four LED signs and install them at two of Reich's commercial properties, two at the "Lock Box" location in Longview, and the other two at a location in Kilgore.[7] At this time, Reich made a down payment of $14,657.25, which was half of the agreed-upon total for the construction and installation of the signs. Reich agreed to pay a second installment of $10,000 once the signs were manufactured and ready for shipment to the appellant, and he agreed to pay the balance of the contract price, $4,657.25, when the appellant completed the installations. Yocum testified that the appellant led her to believe that he would be able to finish the job some time in December—that he "could have it up and running by Christmas."

---

[6] The appellant testified that he ran two such companies, Taylor Made Signs and Taylor Custom Signs. His agreement with Reich is memorialized on a Taylor Custom Signs invoice.

[7] Yocum negotiated the agreement with the appellant; Reich signed the checks. During his testimony, Reich summed up the breakdown of exactly what he had contracted for:

> A. We had two sets of LED signs that we wanted. One of them on the Lock Box storage facility that I own, and one of them on a commercial property that I own down in Kilgore. So there's two sets. You have to have -- there's two different signs per -- per LED, one on each side. So there's four signs total, so two per location.

The invoice memorializing this agreement was dated November 4, 2010.[8] Approximately two weeks later, the appellant contacted Yocum to inform her that the signs were ready and to ask for the second installment payment of $10,000 so that they could be shipped. Yocum made this payment immediately via a check that cleared the bank.

On November 22nd, the appellant applied to the City of Longview for a permit to install a simple "commercial" sign at the Lock Box location. The next day he also applied to the City of Kilgore for a permit to install an "illuminated" sign at the Kilgore location. But Yocum heard nothing from the appellant as the holidays approached, so she tried to contact him. When the appellant finally responded, he offered various excuses, at one point explaining to Yocum that the LED signs were still in transit from China and would not arrive until after Christmas. When January came and Yocum continued to hear nothing from the appellant, she began to "hound" him, mostly via text messages, but the appellant remained evasive. In mid-January, Yocum requested that the appellant provide verification of purchase of the LEDs. The appellant faxed her an invoice on January 28, 2011, reflecting that four signs had been ordered from Affordable LED, Inc., a California company, on November 18, 2010, and that the $22,600 balance on the invoice had been paid in full,

---

[8] The appellant testified that he told Yocum only that he would "try" to install the signs by December. Nothing on the November 4th Taylor Custom Signs invoice memorializes a specific agreement as to when the work would be completed, but both Yocum and Reich testified that they were led to expect that the work would be finished in December.

presumably at that time, with a credit card.[9]  For several months thereafter, Yocum made almost daily attempts to contact the appellant to find out whether the signs had arrived and when the appellant would be able to install them.  Finally, the appellant told her that the signs had shipped from California, and sometime in the early part of March, 2011, he went to the Lock Box location.  But he reported to Yocum that he was unable to complete the installation at that time.  She told him to leave the LED signs, which were apparently packed in cardboard boxes, in a storage area on Reich's commercial premises there.  Yocum saw the cardboard boxes, but she never actually saw the signs themselves.[10]

A few weeks later, as Yocum continued to badger him, the appellant arranged to

---

[9]  The appellant introduced two other invoices for LED signs.  The first was dated November 11, 2010, and it reflects that "Henry Taylor Sign" ordered two LED signs from a Houston company, Elite LED Supply, for the amount of $11,600.  This invoice is stamped "PAID," but it does not make reference to a particular job.  The second invoice is dated much later, February 2, 2011.  It purports to bill "Taylor Custom Signs" the amount of $3,360 each for two LED signs from Affordable LED, the California company.  This invoice is stamped "PAID 03/07/2011," and also shows that two more LED signs were ordered but on backorder.  Nothing on the face of this invoice refers to the Reich jobs either.  The appellant explained that he ordered two of the LEDs for the Lock Box job from Affordable and the other two for the Kilgore job from Elite.  He explained that he had dealt with Elite before and knew that they could deliver within eight or nine weeks.  Although Affordable promised it could deliver within two weeks, the appellant had never dealt with Affordable before.  So he decided to order half of the LEDs from Elite and half from Affordable.  He admitted that the LEDs from Elite were different from those that he had agreed with Yocum to order for the Kilgore job, but he thought that Reich would appreciate the difference because what he actually ordered was more colorful.  He did not attempt to explain why he had faxed Yocum the November 18, 2010, invoice from Affordable.  Nor did he explain why he did not fax her the November 11th Elite invoice at that time.  And he failed to satisfactorily explain why two *additional* LED signs were apparently on backorder, according to the Affordable invoice of February 2, 2011.

[10]  Yocum testified, somewhat cryptically, that "I actually still have one of the boxes[,]" and that it "actually has a piece of the equipment in it."

return to the Lock Box location and to have Pete Gerbine, an independent commercial sign contractor, meet him there to help with the installation of the LED signs. When Gerbine scrutinized the permit that the appellant had obtained from the City of Longview, however, he realized that it did not cover the installation of LED signs.[11] Gerbine offered to take the LED signs back to his shop and, from there, help the appellant to obtain a proper permit, but the appellant loaded the signs into his truck and left the premises.[12] By March 24, 2011, frustrated that the LED signs had still not been installed at the Lock Box and Kilgore locations,[13] Reich contacted the police. On April 8, 2011, the appellant discovered that a warrant had been issued for his arrest, and he turned himself in. But in the meantime, on April 1st, he had applied for a new permit that would allow him to install the LED signs at the Lock Box location. That application was approved on April 27th, but the appellant

---

[11] When asked on cross-examination whether he had realized he lacked the proper permit, the appellant replied, "When I went and pulled it I thought there was a permit. I thought that's all you had to have." But later he explained, "I don't like getting my permits until when I get everything -- the sign in my hand."

[12] Gerbine testified that "the signs never showed up in my shop." It is not entirely clear from Gerbine's testimony whether he ever actually saw the LED signs themselves, although he did testify that, other than the wrong permit, another problem with installing the signs on that day was that "there was some additional bracing that needed to be done to the signs." He did not explain how he was aware of this. For his part, the appellant testified that he did not take the signs to Gerbine's shop because he believed Gerbine was attempting to "take the job" from him. The appellant insisted that he still had all four LEDs in his possession and he introduced photographs of LED signs which he claimed were those that he had ordered for Reich.

[13] By this time, the appellant had actually done some preliminary work at the Kilgore location, but the electrical work had yet to be completed and no LED signs had been installed there.

testified that, on the advice of counsel following his arrest, he never supplied or installed any of the LED signs.

Yocum testified that, at least as of November 4, 2010, when she first contracted with the appellant, she had not harbored any concern that he was trying to steal anything: "The day we signed that I gave him checks. No, I had no qualm whatsoever. By the time he pulled the permits I think the only reason he did it is because I hounded him daily."

Over the appellant's objection, the trial court permitted the State to introduce evidence of other recent contractual obligations that the appellant had undertaken but failed to complete. Four dissatisfied customers testified:

- James Arendell owned an Anytime Fitness franchise. In May of 2009, he contracted with the appellant to install a sign on those premises by August. Arendell paid the appellant approximately $9,000 up front. Although the appellant timely erected a sign, he failed to install the necessary electrical connection. After more than a year of attempting to get the appellant to complete the work and getting nothing but promises and excuses, Arendell eventually hired another contractor to complete the electrical work for $3000. At that point, Arendell realized that the sign that the appellant had erected was insufficiently illuminated. He sued the appellant in small claims court and obtained a judgment of $750, which the appellant has never paid.

- Doris Wallace owned the Village Shopping Center and a Subway restaurant in Hallsville. Wallace hired the appellant in February of 2010 to install a new sign for the shopping center and paid him a first installment of $3,194.10, leaving a balance of $3,188.04. She had contracted with the appellant and his father in the past, and they had consistently completed those jobs. But on this occasion the appellant's work was shoddy and incomplete. When he installed the concrete base for the new sign, it collapsed into a concrete blob. Wallace had to hire Gerbine to fix the damage. Gerbine noticed that the appellant had poured the concrete in a state owned right-of-way, and so he had to

move the base to a different location. After making numerous promises that he would produce a sign and offering various excuses why he had not yet done so, the appellant eventually quit answering Wallace's calls. By June or July, he had yet to produce a sign. Nor did he reimburse Wallace the money she had initially paid him. Wallace hired Gerbine to supply and install a sign.

- Dr. Tucker Lee Woods was a chiropractor who opened an office on Wallace's commercial property at the Village Shopping Center in Hallsville. In February or March of 2010, Woods hired the appellant to construct a sign on the premises to advertise his business. Woods immediately paid the appellant half of the contract price of approximately $2,200, and he paid the balance in May or June. But after four months' time the appellant still had not even begun the work. Nor could Woods ever get a "straight answer" from the appellant to explain the delay, despite numerous attempts. Woods successfully sued the appellant in small claims court and obtained a judgment in excess of $3,000, which the appellant paid only after a constable was sent to collect it. Woods hired another company that was able to install a sign within four to six weeks.

- Cathy Lee owned Java House Coffee in Liberty City. She ordered an unlit sign from the appellant, in September of 2008, and paid him $811, which represented half of the contract amount. Lee believed the sign would be in place within two weeks, but when that did not happen, she began to contact the appellant to find out why. With each call, the appellant would promise to come install the sign "next week." After six months, when the appellant finally produced a sign, it was still unfinished and the wrong size, the text was in the wrong font, and the appellant failed to attach it to the pole securely. The appellant promised to fix it, but he never did. Upon receiving a demand letter from Lee, the appellant apparently promised to reimburse her, assuring her that the "check [was] in the mail," but Lee never received it. Lee filed a civil suit against the appellant and won a default judgment.

At the conclusion of the bench trial, the appellant argued that the evidence failed to establish that, at the time he undertook the contract with Reich, he harbored any intent to deprive Reich of property. He argued that his attempts to complete the contract negated the

requisite intent for theft, referring the trial judge to *Ehrhardt v. State*, an opinion of the Texarkana Court of Appeals.[14]  The prosecutor responded that the evidence established a

> "pattern [by which] what we see is [the appellant] doing a little bit of work, taking a lot of money, and then not completing the task.  That's what we see time and time again from [the appellant].  He gives a lot of excuses until he has gotten all the money he can out of you, and then he stops doing anything for you, right?"

The trial judge took the case under advisement.  The next day, the trial judge filed a letter, which was faxed to the parties, in which he announced, "When we re-convene, I will find the [appellant] guilty."  "What distinguishes this case" from *Ehrhardt*, the trial judge explained, was "the evidence that [the appellant] had participated in similar transactions.  That evidence, along with the evidence of the transaction alleged in the indictment, establishes the requisite mental state."  Later the trial court pronounced the appellant guilty on the record, assessing his punishment at one year's confinement in a state jail and ordering him to pay restitution in the amount of $22,600.[15]

### In the Court of Appeals

On appeal, the appellant once again argued that the amount of work he performed on the contract, however deficiently, nevertheless  served to negate any rational inference that he intended to deprive Reich of property as of the time of their contract.  In a 2-1 decision,

---

[14]

*See* 334 S.W.3d 849, 855 (Tex. App.—Texarkana 2011, pet. ref'd) ("The amount of work performed can negate any intent to deprive at the time of the formation of the contract.").

[15]

The restitution amount assessed reflects the price for the manufacture of the four LED signs, as stated in the November 18th invoice from Affordable LED, Inc. to Taylor Custom Signs.

the court of appeals held that the evidence was sufficient to support appellant's conviction.[16]

Although the court noted that the "mere failure to perform a contract is not sufficient to

establish guilt of theft," the court of appeals identified "at least one instance during the

continuing transaction that stands out, . . . wherein Taylor represented that it was necessary

for Reich to pay $10,000.00 in order to have the signs shipped."[17] It was this representation,

the court of appeals held, that allowed a rational fact-finder to conclude that appellant took

the money by deception, and thus, without the effective consent of the owner. The trial judge

could rationally find "that such representation [that the signs were ready to be shipped] was

false and that it was upon this false representation that Reich paid Taylor $10,000.00."[18]

In dissent, Justice Carter cited *Baker v. State,*[19] in which this same Texarkana Court

of Appeals acknowledged that partial performance of a contract negated the intent to commit

theft through fraud or deception.[20] Although *Baker* allowed for an exception when there is

proof that funds were not used for the contracted project, there was no such evidence of

misapplication in this case, and thus, Justice Carter reasoned, "[w]hile this money was

---

[16] *Taylor*, 2013 WL 6516399 at *4.

[17] *Id.*

[18] *Id.*

[19] 986 S.W.2d 271 (Tex. App.—Texarkana 1998, pet. ref'd).

[20] *Id.* at 275.

probably paid prematurely, there is no evidence it was diverted from the project," and therefore the evidence was insufficient to support appellant's conviction.[21] We granted the appellant's petition for discretionary review to address this dispute.

## THE LAW

The *Malik* standard of a hypothetically correct jury charge for measuring sufficiency of the evidence applies in bench trials.[22] When an indictment alleges theft in the most general of statutory terms, as did the indictment in this case, the hypothetically correct jury charge embraces any and every statutorily defined alternative method of committing the offense that was fairly raised by the evidence.[23] As raised by the evidence in this case, the hypothetically correct jury charge would authorize conviction under the following definitions.

A person commits theft "if he unlawfully appropriates property with intent to deprive the owner" of it.[24] Appropriate means "to acquire or otherwise exercise control over property other than real property."[25] An intent to deprive an owner of his property means an intent "to

---

[21] *Taylor*, 2013 WL 6516399 at *6 (Carter, J., dissenting).

[22] *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

[23] *Geick v. State*, 349 S.W.3d 542, 546 (Tex. Crim. App. 2011).

[24] TEX. PENAL CODE §31.03(a).

[25] *Id.* § 31.01(4)(b).

withhold the property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner."[26] Appropriation is unlawful if it is without the owner's effective consent.[27] Consent is not effective "if induced by deception."[28] There are two statutory definitions of "deception" that are relevant on the facts presented here:

- creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true;[29] and

- promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed.[30]

The question before us is whether, viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense of theft as so defined to a level of confidence beyond a reasonable doubt.[31]

---

[26] *Id.* § 31.01(2)(A).

[27] *Id.* § 31.03(b)(1).

[28] *Id.* § 31.01(3)(A).

[29] *Id.* § 31.01(1)(A).

[30] *Id.* § 31.01(1)(E).

[31] *Geick*, 349 S.W.3d at 545.

Theft cases involving unfulfilled contractual obligations present special problems with sufficiency of the evidence. As we have observed before:

> A claim of theft made in connection with a contract . . . requires proof of more than an intent to deprive the owner of property and subsequent appropriation of the property. In that circumstance, the State must prove that the appropriation was a result of a false pretext, or fraud. Moreover, the evidence must show that the accused intended to deprive the owner of the property at the time the property was taken. In reviewing the sufficiency of the evidence, though, we should look at events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.[32]

A contractor accused of theft may not be convicted of that offense on the theory that he acquired a down payment from his customer by deception if there is no reason to doubt from the evidence that he had every expectation at the time that the money changed hands of fulfilling his contractual obligation; at the time of the down payment, the customer paid voluntarily, and the accused neither intended nor knew he would not perform.[33]

The courts of appeals have picked up on this theme and elaborated upon it. One court of appeals has explained that, "[i]f no more than intent [to deprive] and appropriation is shown in a contract claim, nothing illegal is apparent, because under the terms of the

---

[32] *Wirth v. State*, 361 S.W.3d 694, 697 (Tex. Crim. App. 2012) (citations, footnotes, and quotation marks omitted).

[33] *Phillips v. State*, 640 S.W.2d 293, 294 (Tex. Crim. App. 1982) (relying on TEX. PENAL CODE § 31.01(2)(E) to hold that, "since the down payment was voluntarily given to the appellant pursuant to a contractual agreement and there is insufficient evidence in the record to show the money was obtained by deception, the conviction cannot stand"); *Peterson v. State*, 645 S.W.2d 807, 811-12 (Tex. Crim. App. 1983) (same); *Wilson v. State*, 663 S.W.2d 834, 836-37 (Tex. Crim. App. 1984) (same).

contracts individuals typically have the right to 'deprive the owner of property,' albeit in return for consideration."[34]  Only when, at the time that money is exchanged pursuant to the contract, the accused either intends not to, or at least knows he will not, perform his part of the bargain may he be held criminally liable for theft.  And the courts of appeals have further extrapolated from this principle to hold, moreover, that "if a contract is partially or substantially performed, then intent to commit theft through criminal fraud or deception is not shown by the evidence."[35]  The appellant relies upon these holdings.

But these principles, the courts of appeals have recognized, are not absolute.  For one thing, a contractor may yet be found guilty of theft if, at some point after the formation of the contract, he formulates the requisite intent to deprive and appropriates *additional* property by deception; that is, he induces his customer to make further payment on the contract while no longer intending to perform, or at least knowing that he will not.[36]  Moreover, the fact that

---

[34]

    *Baker*, 986 S.W.2d at 274.  *See also Jacobs v. State*, 230 S.W.3d 225, 230 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ("[T]he State must show a rational factfinder could have found appellant had no intention of fulfilling his obligation under the agreement, and his promise to perform was merely a ruse to accomplish theft by deception.") (citation and internal quotation marks omitted).

[35]

    *Baker*, 986 S.W.2d at 275;  *see also Ehrhardt*, 334 S.W.3d at 855 ("The amount of work performed can negate any intent to deprive at the time of formation of the contract.");  *Phares v. State*, 301 S.W.3d 348, 352 (Tex. App.—Beaumont 2009, pet. ref'd) (when the accused contractor in a theft case performs many of the services contracted for, the evidence fails to establish that appropriation of payment from his customer at the outset of the contract was unlawful in that it was without effective consent because of the accused's deception); *Cox v. State*, 658 S.W.2d 668, 670-71 (Tex. App.—Dallas 1983, pet. ref'd) (same).

[36]

    *Ehrhardt*, 334 S.W.3d at 856 ("The requisite criminal intent can be formed after the

partial or even substantial work has been done on a contract will not invariably negate either the intent to deprive or the deception necessary to establish the unlawfulness of the initial appropriation. A contractor still may be convicted of theft under circumstances—to be sure, circumstances beyond the mere "failure to perform the promise in issue"[37]—in which a rational fact-finder could readily conclude that he *never* intended, even at the outset, to perform fully or satisfactorily on the contract, and always harbored the requisite intent or knowledge to deceive his customer and thereby deprive him of the value of at least a substantial portion of the property thus unlawfully appropriated.[38] The State insists that this is such a case.

**ANALYSIS**

Could a rational trier of fact conclude that, at any time at which the appellant induced Reich to make payment on their agreement, he had no intention to perform—or at least knew that he would not perform—his contractual obligation? The court of appeals answered this

formation of a contract. We emphasize, however, the deprivation of property cannot occur prior to the formation of the requisite intent."); *Higginbotham v. State*, 356 S.W.3d 584, 588 (Tex. App.—Texarkana 2011, pet. ref'd) (same).

[37] *See* TEX. PENAL CODE § 31.01(1)(E) (requiring evidence of more than the "failure to perform the promise in issue" to establish that the actor does not intend to perform or knows he will not).

[38] *See Merryman v. State*, 391 S.W.3d 261, 272 (Tex. App.—San Antonio 2012, pet. ref'd) (the evidence is legally sufficient to prove theft by deception when "[t]he evidence shows a series of transactions between Merryman and customers with the same pattern—promising to complete the construction projects in a short time-frame (one to two months), demanding advance payments on a tight weekly schedule regardless of job progress, beginning a minimal amount of work and then stopping and walking off the job, leaving it unfinished after a 'payment dispute' arose, and giving no refund of payments made").

question affirmatively, effectively holding the evidence sufficient to establish that, at least as of the point in late November of 2010 when the appellant induced Reich to make the second installment payment of $10,000, based upon the apparently false representation that the LED signs had been manufactured and were ready for shipment,[39] he at least *knew* that he would renege on his contract. We agree.

Although far from conclusive, the evidence supports a rational inference that, at least by the time the appellant induced the second payment on the contract, he had formulated the requisite intent to deprive Reich of his money without consideration. Bearing in mind that, by statute, the appellant's failure to perform on the contract will not suffice to establish that he did not intend to, or at least knew he would not, fulfill his contract obligations,[40] we still believe that the evidence is legally sufficient to establish an intent to deprive Reich of

---

[39] The court of appeals observed:

> While we agree with [the appellant] that the entire chain of events does not evidence the intent, at the time the contract was formed, to unlawfully deprive Reich of [his] funds, a false representation made by [the appellant] to induce Reich to make the $10,000.00 payment [on or about November 18, 2010] is legally sufficient evidence supporting a finding of unlawful appropriation, the basis for the claim of theft.

> Based on this evidence, the fact-finder could have reasonably believed that [the appellant] induced Reich to make a $10,000.00 payment within two weeks of the November 5 down payment by falsely representing that the signs were ready for shipment when they were not.

*Taylor*, 2013 WL 6516399 at *5.

[40] TEX. PENAL CODE § 31.01(1)(E).

property of a value of at least $1,500 by deception. Specifically, the evidence of the appellant's inability to satisfy his other contractual obligations before his dealings with Reich and Yocum supports a rational inference that, by the time he induced them to make the $10,000 payment at the end of November, he was aware of a reasonable certainty that he would be unable—whether by unavoidable circumstances or simply by his own "monumental ineptitude in business"[41]—to make good on his agreement to produce and install the LED signs.[42]

We agree with the State that the evidence of the appellant's other contract disputes since taking over the business from his father reveal a pattern from which a rational fact-finder could conclude that the appellant was aware that he would be unable to fulfill his contractual obligation to Reich by the time that he induced the late-November payment. Together, the testimony of Arendell, Wallace, Woods, and Lee established a recent trend whereby the appellant would contract to install a sign, take a substantial initial payment on the contract, inexplicably and unreasonably delay the work while (at least sometimes) inducing the customer (such as Woods and Reich) to make further installment payments, cut off contact with the customer when no further payments were forthcoming, and then

---

[41]  *Id*. at *4.

[42]  *Cf*. TEX. PENAL CODE § 6.03(b) ("A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.").

ultimately fulfill his contractual obligations, if at all, only under duress. The inference that the appellant at least knew he would not perform in this case is certainly less compelling than in *Merryman*, where the defendant's conduct more clearly evinced a purpose to take regular payments without any intention ever to fully perform.[43] But a rational inference was available, nonetheless, that the appellant induced Reich to pay him an additional $10,000 on the contract by falsely representing that the signs had been manufactured and were ready for shipment, and that, *at least* by that time, the appellant was aware of a reasonable certainty that he would be unable to satisfactorily complete his contractual obligation to produce and install the LED signs.

It is true that some of the appellant's conduct would seem circumstantially to dispel the inference that the appellant knew that he would not perform. He sought permits for the installations as early as November 22nd, and showed up at the Lock Box location on two occasions with an apparent purpose to install LED signs there. But the trial court could rationally have concluded from the facts that the Lock Box permit was obviously deficient, that the appellant's conduct on those occasions was evasive, and that the signs were never ultimately installed, that the appellant had a *modus operandi*, as evidenced by his other recent business dealings, to put on an *appearance* of intending to satisfy his contractual obligations while knowing he would not. The evidence in this case is admittedly far from overwhelming, and many fact-finders might just as reasonably have acquitted the appellant. Even so, we

---

[43] *See* note 38, *ante*.

cannot say that the trial court's reliance on the appellant's other recent failures to perform on his contractual obligations to infer both deception and an intent to deprive on the appellant's part in this particular case was "a determination so outrageous that no rational trier of fact could agree."[44]

Justice Carter believed the evidence to be insufficient because there was a failure of proof that the $10,000 the appellant induced Reich to pay in late November, while "probably paid prematurely, . . . was diverted from the project."[45] After discounting the cost of manufacturing the LED signs as determined from the invoices that the appellant produced at trial from Affordable and Elite, Justice Carter calculated that the amount left over roughly corresponded to the amount that the appellant had invoiced Reich for the work he would complete (however unsatisfactorily) at the Kilgore location.[46] But this calculation assumes that the invoices from the manufacturers that the appellant introduced at trial (as opposed to the Affordable invoice of November 18th, which the appellant had faxed to Yocum in satisfaction of her request for verification of purchase, and which Justice Carter himself rejected as "bogus"[47]) necessarily corresponded to LED signs he had ordered for the Reich

---

[44]

*Wirth*, 361 S.W.3d at 698.

[45]

*Taylor*, 2013 WL 6516399 at *6 (Carter, J., dissenting).

[46]

*Id*. *See* note 9, *ante*.

[47]

*Id*.

job. The only evidence that they actually *did* correspond was the appellant's own testimony, both the reliability and credibility of which the trial judge could rationally have chosen to suspect under the circumstances.[48] Indeed, there is at least some reason to doubt that the appellant ever ordered LED signs for the Reich job at all, notwithstanding his production of photographs at trial.[49] The trial court was not bound to find that the $10,000 that the appellant induced Reich to pay by deception in late November was necessarily used for the Reich job. For these reasons, we do not share Justice Carter's concerns.

## CONCLUSION

We remain ever mindful that, in breach of contract cases, an accused may not be convicted for theft based upon nothing more substantial than evidence that, for whatever reason (including his "monumental ineptitude in business"),[50] he "fail[ed] to perform the promise in issue[.]"[51] On the facts of this case, however, we agree with the State that the evidence of the appellant's other contractual failures, combined with his conduct in this case, provided sufficient proof to sustain the trial judge's finding that the appellant obtained

---

[48] *See* note 9, *ante*.

[49] It is not clear from the record that either Yocum or Gerbine ever actually saw the signs, and the appellant himself, besides never satisfactorily explaining the various anomalies with the invoices from the sign manufacturers, never fully justified having ordered a sign for the Kilgore job that was different from the one that he and Yocum had agreed upon. *See* note 9, *ante*.

[50] *Taylor*, 2013 WL 6516399 at *4.

[51] TEX. PENAL CODE § 31.01(1)(E).

Reich's consent to pay the late-November $10,000 installment by deception, and with intent to deprive Reich of that property, in that he knew by that time that he would not perform his contractual obligation as promised. Accordingly, we affirm the judgment of the court of appeals.


DELIVERED:        December 10, 2014
PUBLISH