

# NUMBER 13-16-00080-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JOHNNY RAY PARTAIN,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                    Appellee.

On appeal from the 404th District Court
of Cameron County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Contreras and Hinojosa
Memorandum Opinion by Justice Hinojosa**

Appellant Johnny Ray Partain, proceeding pro se, appeals a conviction for theft in

the amount of $1,500 or more but less than $20,000, a state jail felony.   *See* TEX. PENAL

CODE ANN. § 31.03(e)(4)(A) (West, Westlaw through 2017 1st C.S.).[1]   In two issues, Partain contends that:   (1) the evidence is legally insufficient on the ground that the "elements of theft are superseded under a contract, and intent cannot be shown through criminal fraud or deception when the contract is even partially perform[ed]"; and (2) his due process rights were violated in at least four distinct ways.[2]   We reverse and render an acquittal.

## I. BACKGROUND[3]

Generally, the theft charge stems from the sale and non-delivery of a custom-built generator.   The jury heard from six witnesses:   (1) Dennis Stahl, a South Padre Island homeowner who, during the summer of 2014, was remodeling a newly purchased home on the island and, as part of the remodel, wanted a backup generator that could produce electricity in the event of power outages, such as during and after a hurricane; (2) Jon Wilson, a general contractor retained by Stahl for the remodeling project, including facilitating the generator's procurement and installation; (3) Partain, an electrician and

---

[1] At the time of the alleged offense, the theft of an amount of $1,500 or more but less than $20,000 was classified as a state jail felony.   See Act of June 19, 1993, 73rd Leg., R.S., ch. 900, 1993 Tex. Gen. Laws 2914, 3638 (amended 2015) (current version at TEX. PENAL CODE ANN. § 31.03(e)(4)(A) (West, Westlaw through 2017 1st C.S.)).   Currently, state jail felony theft involves an amount of $2,500 or more, but less than $30,000.   Id.   This change in the law makes no difference to our analysis.   We will refer to the current statute for simplicity's sake.

[2] As best we can tell, Partain complains that his due process rights were violated on the grounds that:   (a) the charges and prosecution were vindictive in nature and instituted by a local elected official; (b) the trial court admitted evidence that was not properly disclosed; (c) the State's closing argument, during which it called Partain a "crook" and a "predator," was calculated to deprive him of a fair and impartial trial; and (d) the trial court erroneously revoked appellant's status as an indigent for purposes of the appointment of appellate counsel.

[3] Because this is a memorandum opinion and the parties are familiar with the facts, we will not recite them here except as necessary to advise the parties of the Court's decision and the basic reasons for it.   See TEX. R. APP. P. 47.4.

2

owner of Atlas Technologies, Inc., an authorized distributor of Generac brand generators; (4) Ken Yuhas, a territory development manager for Generac, (5) Cathryn Grossman, an executive vice president and the chief financial officer of Rio Bank, where Atlas Technologies maintained at least two bank accounts; and (6) Jaime Rodriguez, a detective with the South Padre Island (SPI) Police Department.

## A. The Agreement and a Disputed Delivery Timeframe

Stahl, Wilson, and Partain agree that on June 3, 2014, the three of them met at Stahl's home to discuss the generator's specifications and where it would be located upon installation. According to Wilson, the group selected a custom-built generator by Generac. Stahl testified that, during the meeting, he gave Partain a check for $24,369.24. The check and an itemized invoice from Atlas Technologies were admitted into evidence, and the invoice memorializes the sale of: (a) an 80 kW liquid propane fueled generator for $16,870, (b) a 600 amp transfer switch for $4,982, (c) a mobile link for $252, (d) a mobile link harness for $58, (e) a startup fee for $350, and (f) sales tax, at a rate of 8.25 percent, for $1,857.24.

The meeting participants disagree on the delivery timeframe discussed during the June 3 meeting. Wilson testified that Partain orally promised to deliver the generator in four to six weeks, placing a delivery window of between July 3 and July 17. Partain testified that the order was placed during hurricane season, and he "thought" he told Stahl that he would deliver the generator in nine to twelve weeks, placing the delivery window between August 5 and August 26. Neither the invoice nor the check mention a delivery timeframe.

3

In subsequent communications, Partain told Stahl that the order was placed two weeks after he received Stahl's check because he immediately went on a two-week vacation. According to Wilson, Partain responded to his phone calls, texts, and emails in July 2014. All three agree that the transfer switch, the mobile link, and the mobile link harness, items totaling $5,292, were delivered. However, the generator was not delivered within the timeframe contemplated by either Partain or Stahl and Wilson.

## B.     Records and Order Cancellation

Generac records showed that Partain ordered an 80 kW generator, but there is no indication of when the order was placed. After reviewing bank statements for "Atlas Technology, Incorporated" from June 2014 through September 2014, Grossman testified that $4,571.78 and $10,132.77 were sent by separate wire transfers from that account in June 2014. Yuhas, after reviewing Generac records, testified that it received wire transfers from Partain in June 2014 for the two exact amounts Grossman had identified as payment for a 600 amp transfer switch, a 30 kW generator, and a 400 amp transfer switch. These products were unrelated to those that Stahl purchased from Partain.

Grossman testified that the bank statements she reviewed showed a balance of $345 at the end of July. In response to Grossman's testimony, Partain asserted his "Atlas" business maintained multiple bank accounts at Rio Bank. On cross-examination by Partain, Grossman was presented with bank statements from "Atlas Technology, Non-operating." According to Partain's questions of Grossman, the non-operating account showed credits and debits that would have covered the cost of Stahl's generator, though the timeframe for cobbling together sufficient funds remained unclear.

4

Partain testified that he ordered the generator Stahl purchased but that in business "[m]oney comes in; money goes out." Partain also testified, "I don't—it benefits my company to have cash in the bank to make it look like I'm okay for loan companies, or whoever I might want to—." He maintained that the payment period for Stahl's generator was the first half of October 2014 and that in September 2014 he received "a fairly decent check that would have covered everything easily." Partain did not elaborate on who made the check or its amount. During the State's cross-examination of Partain, he testified that he may have been able to pay for Stahl's generator from all of the Rio Bank accounts combined or he may have been a few dollars short.

Through conversations with a Generac representative, Wilson learned that, although a deposit had been placed on the generator ordered for Stahl and it was manufactured and ready for shipment, it would not be shipped until full payment was received. Yuhas testified that, on August 28, 2014, Generac informed Partain by email and voicemail that the order for Stahl's generator was cancelled due to nonpayment.[4]

## C. Breakdown in Communication, Investigation, and Civil Lawsuit

By September 2014, Partain had stopped responding to communications from Stahl and Wilson. In October 2014, Wilson told Partain that he would be reported to the SPI police department. On October 27, 2014, Detective Rodriguez and another detective interviewed Partain. The following day, Partain emailed Stahl:

> I spoke to Padre Island police yesterday regarding your theft complaint. While I believe it is without merit, it does raise the question of when I can

---

[4] The Generac paperwork that Yuhas reviewed shows a different cancellation date. According to the paperwork, payment for Stahl's generator was due on November 27, 2014. Generac's policy, according to Yuhas, is that an order is cancelled if payment is not received ten days before the due date. Therefore, the paperwork Yuhas reviewed reflected a cancellation date of November 17, 2014.

deliver your generator. Attached is a copy of an invoice from Generac showing a zeroed invoice for the order, I assume that Generac canceled the order when Padre Island police contacted them last week. Normally I am bound by contract to pay Generac for what I order, but it appears that is no longer the case in this instance. Consequently, this leaves me with two options: To reorder the generator or to refund your money. I think you would agree with me that refunding your money would be preferable. I will need about 60 days to fully recover your monies. I apologize for the frustrations and I will give you a call this afternoon.

Stahl responded to Partain's email:

First, you have a third option . . . arrest for criminal theft of over $20,000. I want you arrested and charged. The order was placed 6/3/14, What a preposterous offer! Wait 60 more days until January 2015 for a refund I guess your story at that time was that Santa didn't deliver the cash at Christmas! You stole my deposit and have made no effort to repay. We have been in contact with Generac all along. Your "invoice" attached with a zero balance is another joke[.] All you did was cancel the order another delaying tactic[.] If you were bound by Generac to pay for the order, you never did. Another lie[.]

DO NOT call me. WE called you over 20 times and you lied to us or never returned our calls. You stole the money. Then you had the nerve to think your $20,000 theft was a "civil" matter—really? You had NO intention to deliver a generator or a refund. What a surprise when you heard it was criminal! The South Padre Island Police Department has done their job.

You are a thief and I want you arrested, charged, and convicted.

After reading this email exchange, Detective Rodriguez emailed Partain:

This is Detective Jaime Rodriguez with the South Padre Island Police Department. I am the one that interviewed you along with Detective Victor Carranza in regards to South Padre Island Police Department Case #14-02029 Theft. I will take responsibility for advising you that if you made contact with Mr. Stahl between yesterday and Wednesday to resolve the matter and that if you and Mr. Stahl came to an agreement then our investigation would be completed.

Although as I have read your emails to Mr. Stahl and you have twisted the words of our interview yesterday and made it appear that this agency to include Detective Victor Carranza and I are being hounded for a prosecution. I can assure as I did clearly state to you yesterday if that

6

would have been the case you would have been arrested yesterday and charged with Felony Theft.

I further advised you that I wanted to remain unbias[ed] in this investigation and wanted to give you an opportunity to get this matter resolved. You have taken that opportunity to twist words and the direction I thought you would take. I now am requesting you to cease any type of communication with Mr. Stahl. Your failure to cease communication could result in additional criminal charges being filed on you not by Mr. Stahl but by the State [o]f Texas. The content of your emails are clearly not to clear this matter up with Mr. Stahl and it further appears that you are trying to shift the blame of you violating Texas State Law Penal Code 31.03 to someone else and a personal vendetta against this agency and Mr. Stahl.

This email will be considered your notification not to make contact with Mr. Stahl in any manner.

Partain claimed that he stopped trying to resolve the dispute with Stahl because of Detective Rodriguez's email and that is why the generator was never delivered.

Stahl eventually purchased a second generator from a different distributor at a cost of between $16,000 and $19,000, and he received it in six weeks. Partain testified that such a delivery timeframe is possible outside of hurricane season. In November 2014, Stahl filed a civil lawsuit for breach of contract, conversion, theft, and fraud against Atlas Technologies, Inc. and Partain. By the time the trial began, Partain had procured a natural gas powered generator that he was willing to install in Stahl's house. As evidence, Partain offered a receipt from Victoria Farms. However, Partain redacted the price he paid because, to him, it was irrelevant.

## D.    The Charges and the Judgment

A grand jury indictment accuses Partain of "unlawfully appropriat[ing], by acquiring or otherwise exercising control over, property, to-wit: US currency, of the value of $20,000 or more but less than $100,000, from Dennis Stahl, the owner thereof, with intent

to deprive the owner of the property." The State moved to (and the trial court granted) an amendment to the indictment to reflect theft in the amount of $1,500 or more but less than $20,000. A jury found Partain guilty. The trial court assessed punishment at two years' confinement, but it suspended the sentence and placed Partain on community supervision for five years. The trial court also fined Partain $5,000 and ordered him to pay $17,220 in restitution. This appeal followed.

## II. LEGAL SUFFICIENCY

In Partain's first issue, he challenges the legal sufficiency of the evidence supporting the jury's finding of intent. Specifically, Partain argues that a "court cannot infer intent that might exist at a later date to a previous action, as prosecutors argued to the jury."

### A. Standard of Review

When evaluating a legal sufficiency challenge, the reviewing court views the evidence in the light most favorable to the verdict to determine whether a rational jury could find the defendant guilty beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.); *see Jackson v. Virginia*, 443 U.S. 307, 319, (1979). The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, and a reviewing court is not to substitute its judgment as to facts for that of the jury as shown through its verdict. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). When the reviewing court is faced with a record supporting contradicting inferences, the court must presume that the jury resolved any such conflict in favor of the verdict, even if it is not explicitly stated in the record. *Id.*

8

A reviewing court must measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* In order to have reversal of a conviction on a claim of insufficiency of the evidence, Partain must show that no rational jury could have found all the elements of the offense beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 902.

## B.    Applicable Law

A person commits an offense of theft of property if he unlawfully appropriates property with the intent to deprive the owner of the property. TEX. PENAL CODE ANN. § 31.03. Appropriate means "to acquire or otherwise exercise control over property other than real property." *Id.* § 31.01(4)(B) (West, Westlaw through 2017 1st C.S.). The intent to deprive an owner of his property means an intent "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner." *Id.* § 31.01(2)(A). Appropriation is unlawful if it is without the owner's effective consent. *Id.* § 31.03(3). Consent is not effective if induced by deception. *Id.* § 31.03(3)(A); *see Taylor v. State*, 450 S.W.3d 528, 535 (Tex. Crim. App. 2014). There are two statutory definitions of "deception" that are relevant here:

(A)     creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true; [and]

. . . .

(E)     promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed.

TEX. PENAL CODE ANN. § 31.01(a)(A), (E).

In *Martinez v. State*, No. 13-15-00295-CR, 2017 WL 929481, at *5 (Tex. App.—Corpus Christi Mar. 9, 2017, pet. filed), we recognized that theft involving a contract or a written agreement, such as the invoice from Atlas Technologies and the canceled check by Stahl,[5] presents a special set of circumstances.   Finding guidance from the court of criminal appeals, we quoted it:

> A claim of theft made in connection with a contract . . . requires proof of more than an intent to deprive the owner of property and subsequent appropriation of the property.   In that circumstance, the State must prove that the appropriation was a result of a false pretext, or fraud.   Moreover, the evidence must show that the accused intended to deprive the owner of the property at the time the property was taken.   In reviewing the sufficiency of the evidence, though, we should look at events occurring before, during, and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.

*Id.* (quoting *Taylor*, 450 S.W.3d at 536). However,

> a contractor may yet be found guilty of theft if, at some point after the formation of the contract, he formulates the requisite intent to deprive and appropriates *additional* property by deception; that is, he induces his customer to make further payment on the contract while no longer intending

---

[5] It appears that Stahl believes that the dispute is both civil and criminal in nature whereas Partain believes that it is only civil.   We assume, without deciding, that the special circumstances governing the intersection of contractual disputes and theft are present here.

to perform, or at least knowing that he will not.

*Taylor*, 450 S.W.3d at 536 (emphasis in original); *see Ehrhardt v. State*, 334 S.W.3d 849, 856 (Tex. App.—Texarkana 2011, pet. ref'd) (stating the requisite criminal intent can be formed after the formation of a contract). "Moreover, the fact that partial or even substantial work has been done on a contract will not invariably negate either the intent to deprive or the deception necessary to establish the unlawfulness of the initial appropriation." *Taylor*, 450 S.W.3d at 536. Lastly,

> [a] contractor still may be convicted of theft under circumstances—to be sure, circumstances beyond the mere failure to perform the promise in issue—in which a rational fact-finder could readily conclude that he *never* intended, even at the outset, to perform fully or satisfactorily on the contract, and always harbored the requisite intent or knowledge to deceive his customer and thereby deprive him of the value of at least a substantial portion of the property thus unlawfully appropriated.

*Id.* at 537 (internal citations omitted; emphasis in original).

## C.    Discussion

In response to Partain's legal sufficiency challenge regarding the intent element, the State argues that a rational fact-finder could have inferred from the evidence that the monies Partain used to run his business after he received the check from Stahl were in fact Stahl's monies. The State points to Grossman's testimony explaining the bank account statements. Specifically, the State highlights two June 2014 wire transfers to Generac that were not for the generator Stahl had purchased, and it argues that Partain's bank account balances were less than the amount that they should have been if Stahl's monies were there.

The courts in *Taylor* and *Ehrhardt* have grappled with legal sufficiency challenges

11

to the intent element in theft cases involving construction contracts. In *Taylor*, 450 S.W.3d at 531, an outdoor sign installer contracted in November for the installation of LED signs for a total price of $29,314.50, with the installation to be done before the Christmas holidays. The purchaser made an initial down payment of half the purchase price and an additional $10,000 when, two weeks later, the installer represented to the purchaser that the signs had shipped to the installer; the purchaser would pay the outstanding balance after installation. *Id.* The installer in fact received the signs in March of the following year, and he was charged with theft in April. *Id.* at 532. At the installer's trial, four dissatisfied customers testified as to the installer's failure to complete jobs that the customers had paid for in advance. *Id.* at 533. The trial court, sitting as the fact-finder, found the installer guilty, and a divided intermediate appellate court affirmed. *Id.* at 534. The court of criminal appeals agreed with the Sixth Court of Appeals that the evidence was legally sufficient to establish that, at least as of when the additional $10,000 payment was made, the installer *knew* that he would renege on his contract. *Id.* at 537–38.

The disposition was different in *Ehrhardt*. 334 S.W.3d at 860. In *Ehrhardt*, the owner of a home damaged by fire received $100,000 from his insurer for restoration. *Id.* at 851. The homeowner's agent retained a contractor to complete all of the restoration work for a total price of $65,000. *Id.* As work progressed, the contractor was paid a total of approximately $86,500, but additional work was necessary. *Id.* at 852. When the homeowner's agent refused to make additional payments, the contractor walked off the job. *Id.* The agent hired a different contractor to complete the work for $30,000, and

12

she filed criminal charges against the initial contractor. *Id.* In explaining how the timing of a contractor's intent to deprive affects the legal sufficiency analysis, the court wrote:

> [The contractor] argues that the State was obligated to establish [the contractor] intended to unlawfully deprive [the agent] of property when the contract was formed. Under [the contractor's] stated position, once a contract is formed absent the requisite criminal intent, the dispute remains always civil in nature. We disagree. While we agree "[r]elevant intent to deprive the owner of property is the accused's intent at the time of the taking," [*Wilson v. State*, 663 S.W.2d 834, 836–37 (Tex. Crim. App. 1984); *Lopez v. State*, 316 S.W.3d 669, 676 (Tex. App.—Eastland 2010, no pet.),] we disagree that a criminal intent to deprive cannot arise after the formation of the contract. This Court has previously stated "[a] claim based upon malfeasance in connection with a contract requires proof of the false pretext or fraud in order to become a viable criminal prosecution." *Baker v. State*, 986 S.W.2d 271, 274 (Tex. App.—Texarkana 1998, pet. ref'd). The requisite criminal intent can be formed after the formation of a contract. We emphasize, however, the deprivation of property cannot occur prior to the formation of the requisite intent. *Cortez v. State*, 582 S.W.2d 119, 120–21 (Tex. Crim. App. [Panel Op.] 1979). Thus, if the intent to unlawfully deprive did not develop until after the formation of the contract, there must be an additional deprivation of property in connection with the recently formed criminal intent.

*Ehrhardt*, 334 S.W.3d at 855–56.

Unlike in *Taylor* and *Ehrhardt*, there was no additional payment made after the initial payment, and Stahl's check was issued the same date as Atlas Technologies' invoice. Therefore, the intent to deprive, if any, had to have been present at the contract's formation. Under *Taylor*, there must be some evidence from which a rational fact-finder could conclude that Partain *never* intended, even at the outset, to perform fully or satisfactorily on the contract, and *always* harbored the requisite intent or knowledge to deceive Stahl and thereby deprive him of the value of at least a substantial portion of the property thus unlawfully appropriated. *See* 450 S.W.3d at 537. On this point, the State's evidence falters. It primarily relied on contemporaneous and subsequent (June

13

2014 through September 2014) bank statements and Generac's prepayment and cancellation polices to satisfy the temporal elements of *never* and *always* articulated in *Taylor*. While we may look to subsequent events, there still must be evidence showing an understanding and common design to do the prohibited act. *Id.* at 536. Moreover, there must be evidence of more than the subsequent failure to perform. *See* TEX. PENAL CODE ANN. § 31.01(a)(E).

Lending every reasonable inference to the bank statements, they show that Partain's expenses exceeded his income from June 2014 through September 2014. But, the records from Generac show that Atlas Technologies, Inc. paid to it, either by check or wire transfer, amounts ranging from $16,808.69 to $18,624.45 between 2012 and 2013 and $17,311.70 for a shipping date of January 2015. The Generac records show that before and after the dispute with Stahl, Partain's business was capable of fulfilling orders similar to Stahl's. Thus, the State's evidence forced the jury to speculate that, unlike the other customers, Partain never intended to fulfill Stahl's order.[6] If the evidence at trial raises only a suspicion of guilt, even a strong one, then that evidence is insufficient to sustain the conviction. *See Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010). We conclude that there was insufficient evidence that Partain acted with the requisite intent required for a theft conviction. *See Brooks*, 323 S.W.3d at 899; *Taylor*, 450 S.W.3d at 536–38.

---

[6] The State's belief that Stahl's funds should have been earmarked by Partain appears to have resonated with the Texas Legislature with regard to contractors and subcontractors. *See generally* TEX. PROP. CODE ANN. § 162.001(a) (providing that construction payments are trust funds), § 162.032 (providing penalties for misappropriation of trust funds) (West, Westlaw through 2017 1st C.S.). However, charges under the property code were not brought.

Partain's first issue is sustained.[7]

## III. Conclusion

The trial court's judgment is reversed and an acquittal is rendered.

LETICIA HINOJOSA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
16th day of November, 2017.

---

[7] Because Partain's first issue is dispositive, we need not address Partain's second issue. *See* TEX. R. APP. P. 47.1. Furthermore, any pending motions are dismissed as moot.